ISLAMIC REPUBLIC OF IRAN, Appellant-Respondent, v MOHAMMED REZA PAHLAVI, Defendant, FARAH DIBA PAHLAVI, Respondent-Appellant.

First Department, June 30, 1983

APPEARANCES OF COUNSEL

*Brian O'Dwyer* of counsel (*O'Dwyer & Bernstein,* attorneys), for appellant-respondent.

*Roger Boyle* of counsel (*Boyle, Vogeler & Haimes,* attorneys), for respondent-appellant.

OPINION OF THE COURT

SILVERMAN, J.

This is an appeal from an order of Special Term, Supreme Court, granting a motion to dismiss the complaint on the ground of *forum non conveniens.* We affirm.

This is a suit by the Islamic Republic of Iran against the former Shah of Iran and his wife, the former Empress of

Iran, based upon the alleged misconduct of the Shah in enriching himself and his family through the exercise and misuse of his powers as emperor.

If entertained, the suit will be extremely burdensome to the people, taxpayers and the courts of this State. The amounts involved are enormous — many billions of dollars. The assets referred to are numerous and enormous and located all over the world. What is sought is no less than a review by the courts of this State of the exercise by the Shah of his powers as absolute monarch of a great Nation over a period of a quarter of a century to determine whether and by how much the Shah and the Empress personally and improperly profited. It would be an understatement to say that this lawsuit would be as burdensome as a total of hundreds of ordinary lawsuits. And the courts of New York are asked to assume this burden while our criminal justice system is crumbling because of inadequate facilities; prisoners sit in jails for months awaiting trials; civil litigants are delayed because our courts are so overcrowded. And, of course, the cost of this suit to the taxpayers of New York would be very great.

All of this would have to be borne if this were legitimately a New York matter. But it is not. It is an Iranian matter, a suit by the Islamic Republic of Iran against its former ruler and his wife, nationals (and still presumably domiciliaries, never having elected a new domicile) of Iran, based on acts in Iran relating to the affairs of Iran.

The suit would presumably be governed by Iranian law. It may be questioned whether the law of Iran ever contemplated a suit against the Shah for misconduct in office; but in any event whatever the guess may be, it will have to be a guess as to *Iranian law*.

We doubt that the courts of this State are really competent to pass on whether an absolute monarch of a foreign country can be held responsible for personally profiting from the use of his powers as an absolute monarch.

In this State and in this country the guess as to Iranian law would have to be made by American Judges brought up and trained in American law, history and political philosophy, and the mores of a democratic republic and the

prevailing concepts in this country as to the responsibilities and obligations of public officials in such a republic.

For us, and perhaps generally in countries that have a constitutional government, the rule of law is that public office is a public trust, not to be used for the office holder's personal profit and subject to rules of fiduciary responsibility. (Of course we do not suggest that the use of public office for private profit is unknown in this country; however, the rules of law applicable to such cases in this country are fairly well established.) But do we have the right to impose our concepts of the responsibility of public office on the activities within a foreign country of its absolute monarch? Are we justified in applying American concepts of fiduciary responsibility to this situation, or is the case to be governed by Louis XIV's dictum *"L'état, c'est moi"*, or some other rule — and this under unformulated Iranian law!

Repugnant as it may be to our philosophy, there can have been very few absolute monarchs in the history of the world who did not profit personally from their powers as such monarchs. The royal families of history did not become wealthy because they were shrewd private businessmen or farmers. One thinks of Elizabeth I and monopolies; the Kings of Spain and the wealth of the New World; the Tsars of Russia; King Solomon's mines, etc., etc. And even today it is said that the King and the royal family of Saudi Arabia and the rulers of the other oil rich States of the Middle East have become enormously wealthy by the use of their powers and influence as rulers. These rulers and their families are said to have large investments and bank deposits in this country. Are the courts of New York really competent to hold these rulers responsible under our concept of fiduciary responsibilities for their use of their monarchical powers?

This surely looks like the "political thicket" out of which courts should stay.

The dispute is as we say an Iranian dispute to be governed by the laws of Iran. What connection does New York have with it? That the Shah spent a few weeks in a hospital in New York may be a basis for in personam jurisdiction. It is irrelevant to *forum non conveniens* considerations. (Inci-

dentally, the Shah spent more time, after leaving Iran, in Mexico, Panama and Egypt than he did in New York, so why are we favored with this litigation?)

Although the list of assets does include some assets with a relation to New York, this is not a case of a dispute as to the ownership of specific property in this State. The complaint asks to impress a constructive trust on assets of the defendants throughout the world; it asks for an accounting of all moneys and property of any kind received by the defendants from the government of Iran, together with all profits derived therefrom; it asks for general compensatory damages totaling $35 billion, and total damages of over $55 billion. This is plainly a transitory action arising in Iran.

All of the foregoing is recognized by our brother who would retain jurisdiction in New York, but he asks if this lawsuit cannot be brought in New York, where else can it be brought? Where is the more appropriate forum?

The obvious answer — in a civilized world and society — would be Iran, which has all the relevant contacts. The defendants would of course contend that they cannot get a fair trial before an impartial tribunal in Iran; and they may well be right. And implicit in the plaintiff's position is that at least the prevailing perception in non-Iranian countries is that the present regime in Iran is "a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law" (CPLR 5304, subd [a], par 1), and thus the judgment of its courts would not be entitled, either as a matter of comity or of absolute right, to recognition in jurisdictions having principles similar to New York.

For almost any other plaintiff, this would be a sound and fair reason for bringing a suit outside Iran. But this plaintiff is the Islamic Republic of Iran — the government of Iran. It is a fundamental obligation of every civilized government to provide a system of impartial courts which can fairly adjudicate disputes involving its citizens. As plaintiff is the government of Iran, that is plaintiff's own obligation. And if this plaintiff has failed in that fundamental obligation, we do not see why the citizens, taxpay-

ers and courts of this State should be subjected to the enormous burden of this lawsuit at the behest of the government which has failed to meet this fundamental obligation.

There are of course also questions as to personal jurisdiction.

The Uniform Foreign Money-Judgments Recognition Act, CPLR article 53, requires as conditions for conclusive recognition of a foreign country judgment that the judgment not only be rendered under a system which provides impartial tribunals or procedures compatible with due process of law, but also that the foreign court shall have had personal jurisdiction over the defendant. (CPLR 5304, subd [a].) Such jurisdiction may exist because the defendants are domiciliaries of the foreign State (CPLR 5305, subd [a], par 4), or indeed because they are nationals of that State. (Restatement, Conflict of Laws 2d, § 31; Thirteenth Ann Report of NY Judicial Conference, 1968, p 221; see *Blackmer v United States,* 284 US 421.) With respect to jurisdiction based on nationality, the Restatement (*op. cit.,* p 127) provides: "§ 31. Nationality and Citizenship. A state has power to exercise judicial jurisdiction over an individual who is a national or citizen of the state unless the nature of the individual's relationship to the state makes the exercise of such jurisdiction unreasonable." Comment *c* under this statement includes as examples of qualifications on the jurisdiction of a foreign State over its nationals: "[T]he extent, if any, to which the national's life or liberty would be endangered if he were to return to the nation * * * The judgment is also likely to be denied recognition and enforcement if the national has been forced to flee from the nation because of a political regime that is hostile to him, even though he may hope to return to the nation once the regime has been overthrown" (*id.,* p 128). These qualifications obviously apply to the Empress and applied to the Shah after his flight. But again the personal danger, and the unfairness to the defendants of recognizing the exercise of personal jurisdiction by the courts of Iran over the defendants, is little more than another facet of the failure of the government of Iran to provide fair and

impartial tribunals in which the property and money claims against the Shah can be fairly determined.

It may well be that it is wholly unrealistic to ask this of a revolutionary regime like that of Iran. Robespierre's regime in France, or the Bolshevik regime in the time of Lenin, could not be expected to provide calm, impartial tribunals to hear property claims against the Bourbons or the Romanovs. If this means that defendants-wrongdoers, — if they are wrongdoers — may escape liability in the civil courts, perhaps that is just one of the inevitable concomitants of a revolution. (Perhaps, even, the revolutionary remedy and the judicial remedy against rulers are fundamentally incompatible, so that the revolutionary government can no more seek judicial relief against its former rulers than the former rulers can against the revolutionary government.) But none of that makes it the responsibility of New York to provide to the revolutionary regime that system of fair, impartial, safe and generally recognized tribunals which the revolution has made impossible in Iran. They are not reasons for imposing on the people of New York the huge burden of this lawsuit.

Nor should the fact that plaintiff chose to bring its suit in New York, rather than in one of the other jurisdictions where the Shah sojourned after his flight, force us to accept the burden of that suit.

New York will have fully discharged its limited responsibility to provide a system of justice applicable to the dispute between plaintiff and its former rulers if New York courts are available for the determination of disputed claims to the ownership of specific property having a situs in New York. That is not this case; it is not even a case arising out of a specific and specifically described and identified transaction (as to which we express no opinion).

On July 27, 1980, while the motion was pending in Special Term, the defendant former Shah of Iran died.

CPLR 1015 (subd [a]) provides: "If a party dies and the claim for or against him is not thereby extinguished the court shall order substitution of the proper parties."

We have not been informed of any such substitution, and apparently at least as of the time of Special Term's decision

no personal representative of the defendant former Shah of Iran had been appointed.

CPLR 1021 provides in part: "Whether or not it occurs before or after final judgment, if the event requiring substitution is the death of a party, and timely substitution has not been made, the court, before proceeding further, shall, on such notice as it may in its discretion direct, order the persons interested in the decedent's estate to show cause why the action or appeal should not be dismissed."

Accordingly, this court directs that such an order to show cause why the appeal should not be dismissed with respect to the defendant former Shah of Iran shall issue, and the appeal will be held in abeyance with respect to the action against the former Shah of Iran pending the determination on such order to show cause.

As to the action against defendant Farah Diba Pahlavi, the former Empress of Iran, the order of the Supreme Court, New York County (IRVING KIRSCHENBAUM, J.), entered November 20, 1981 granting defendant's motion to dismiss the complaint pursuant to CPLR 327 on the ground of *forum non conveniens,* should be affirmed, with costs.

KUPFERMAN, J. P. (concurring). I concur that the order by Special Term dismissing the complaint on the ground of *forum non conveniens* should be affirmed. Under the exceptional circumstances of this case, dismissal on that ground was not an abuse of discretion despite the apparent absence of a viable alternative forum.[1]

Based on equitable considerations of justice, fairness, and convenience, *forum non conveniens* is a flexible doctrine, codified in New York (CPLR 327),[2] whereby a court may in its discretion decline to exercise jurisdiction over a transitory cause of action which does not bear a substantial nexus to the State of New York. (See *Martin v Mieth,* 35

---

1. A more logical forum in which to try this action would be Egypt inasmuch as the Shah died in Egypt and spent more time there than in New York. However, it is unlikely that defendants would consent to jurisdiction in Egypt, and the record fails to set forth the jurisdictional law of Egypt or of any other possible forum.

2. That section provides in relevant part: "Rule 327. Inconvenient forum. When the court finds that in the interest of substantial justice the action should be heard in another forum, the court, on the motion of any party, may stay or dismiss the action in whole or in part on any conditions that may be just."

NY2d 414, 418; *Irrigation & Ind. Dev. Corp. v Indag S. A.,* 37 NY2d 522, 526; *Silver v Great Amer. Ins. Co.,* 29 NY2d 356, 361.)

This litigation between two successive despotic regimes of a distant Nation bears no substantial nexus to the State of New York. Special Term, in its memorandum decision, considered all of the relevant factors for determining whether New York is an inconvenient forum for the trial of a particular action. (See *Varkonyi v S.A. Empresa De Viacao Airea Rio Grandense [Varig],* 22 NY2d 333, 338.) None of these considerations points to New York as a convenient forum for the trial of this action except the possible lack of an alternative forum. None of the events complained of took place in New York. No mention is made of the presence in New York of any witnesses whose testimony would be required. Nor would it serve the convenience of the court, an important consideration (see *Bata v Bata,* 304 NY 51, 56), to be required to interpret and apply Iranian law.[3]

Reyling on *Gulf Oil Corp. v Gilbert* (330 US 501), and its progeny, for the proposition that the *non conveniens* doctrine "presupposes at least two forums in which the defendant is amenable to process" (330 US, at p 507), the dissent holds that the absence of an alternative forum to which defendant would either consent or be amenable to jurisdiction precludes dismissal on *forum non conveniens* grounds.

However, in *Gulf Oil Corp. v Gilbert* (*supra*) the United States Supreme Court acknowledged the inherent power of a court to decline to exercise jurisdiction in the interests of justice where exceptional circumstances exist (330 US, at p 504; see, also, *Canada Malting Co. v Paterson Co.,* 285 US 413, 422-423).

---

3. Iranian law under the Shah was based on an entirely different set of principles from those underlying American jurisprudence. Codified more than 50 years ago, the Iranian law then in effect drew its tenets from both Islamic and European sources. (See *Farmanfarmaian v Gulf Oil Corp.,* 437 F Supp 910, 924 [SDNY, 1977], affd 588 F2d 880.)

The complaint charges that the late Shah, aided and abetted by his wife, breached a duty of trust allegedly applicable under the terms of his constitutional monarchy, by converting national assets to his personal use. Plaintiff has failed to plead with particularity (CPLR 3016, subd [e]) the substance of the applicable foreign law.

In *Noto v Cia Secula di Armanento* (310 F Supp 639 [SDNY, 1970]), the court declined to exercise jurisdiction over a suit between aliens arising from an explosion of a tanker in an Iranian port. In that case, Judge WEINFELD (p 648) rejected the argument that the absence of an alternative forum in which defendants would be subject to jurisdiction precluded the court from exercising its discretion under *forum non conveniens* to dismiss the suit.[4]

Aside from considerations of the burden of trying this action in the already congested courts of New York, Special Term providently exercised its discretion to protect our courts from becoming embroiled in the internal politics of a foreign Nation. By what standard would a New York court pass judgment on the perquisites of an emperor? No court should be required to serve as a paymaster of the spoils of empire, or referee between dictators. (Cf. *Stone v Freeman,* 298 NY 268, 270-271; *Flegenheimer v Brogan,* 284 NY 268.)[5]

FEIN, J. (dissenting). The issue on this appeal is *forum non conveniens,* not whether we approve of the government of Iran, or even whether the complaint is dismissable for failure to state a cause of action.

Plaintiff, the presently constituted government of Iran, brought this action in November, 1979 against the former

---

4. In dismissing the complaint in that case, Judge WEINFELD stated (p 648): "Despite these overwhelming factors, which strongly support refusal of jurisdiction, plaintiffs contend that dismissal of these suits is foreclosed, since the doctrine of forum non conveniens 'presupposes at least two forums in which the defendant is amenable to process; [it] furnishes criteria for choice between them.' They argue that none of the defendants here is amenable to process in an obviously more convenient foreign forum; nor has any defendant agreed to submit to such foreign jurisdiction. In sum, plaintiffs contend that upon this ground alone the Court is without discretion in the matter and lacks power to decline to entertain jurisdiction. This Court does not agree. Essentially, the discretion which the Court is called upon to exercise under the doctrine * * * invokes the Court's inherent power to decline jurisdiction 'in the interest of justice.'"

It is noteworthy in this respect that CPLR 327 authorizes a court to dismiss an action in the interest of substantial justice upon *any* conditions that may be just. The rule does not by its terms require that the dismissal be conditioned on defendant's consent to jurisdiction in another forum.

5. Of course this line of cases, involving the refusal of a court to enforce an illegal contractual arrangement, is factually distinguishable from the present case. The underlying principle, however, is applicable. A court should not lend its aid to a corrupt or evil design. One who seeks equity must do equity.

rulers of Iran, defendant Mohammed Reza Pahlavi (the Shah) and his wife, defendant Farah Diba Pahlavi (the Empress), alleging misappropriation and conversion of several billion dollars worth of property. The complaint seeks imposition of a trust and an accounting as to assets held by defendants individually and "in the name of the Pahlavi Foundation or other foundations, corporations, organizations, or associations"; an injunction against sale, transfer, removal, disposal or other alienation of these assets; compensatory damages of $20 billion and $5 billion, and punitive damages of $1 billion and $500 million, against the respective defendants; and recovery of $30 billion in money and property allegedly converted.

At the time of the commencement of this action, the Shah was a patient at New York Hospital in Manhattan. Defendants had fled Iran in January of 1979, during the political upheaval by which plaintiff succeeded to power there, and in June of that year their odyssey in exile brought them to temporary safety in Mexico. There they remained until October, when they flew to New York on a temporary entry visa so that the Shah, suffering from cancer, could obtain special medical treatment here. The Empress took up residence during this sojourn at the home of the Shah's sister in Manhattan while the Shah was hospitalized. It was during defendants' two-month stay in New York that the United States Embassy and Consulates in Iran were overrun and American citizens were taken hostage. Among plaintiff's demands in exchange for release of the hostages was that the Shah and all his wealth be returned to Iran.

Three and a half weeks later, on November 27, 1979, this action was commenced with service of a summons and complaint upon the Empress by mailing of the papers to her sister-in-law's residence and delivery to a bodyguard there by a New York City deputy sheriff (CPLR 308, subd 2). After unsuccessful attempts at serving the Shah personally at New York Hospital, plaintiff obtained a court order on November 30 permitting alternative service personally upon the administrator or night administrator of

New York Hospital, as well as mailed service upon Secretary of State Cyrus Vance in Washington, the District Director of the United States Immigration and Naturalization Service in New York, former Secretary of State Henry Kissinger, and Chase Manhattan Bank Chairman David Rockefeller (CPLR 308, subd 5; 308, subd 2). Mailed service was also effected upon Robert and Richard Armao, the Shah's personal representatives and spokesmen who had earlier been personally served, with some difficulty, at the hospital. The alternative service on the Shah, by personal delivery to the hospital night administrator permitted by the court order, as well as the mailed service to the Shah, the Armaos and the persons designated in the court order, all took place on or after November 30, 1979, the date of the Supreme Court order authorizing such service. The previous day the Mexican government had withdrawn permission for the Shah to return to that country, rendering defendants "stateless", in effect "persons without a country". Although the Empress was served by substituted service just prior to the Mexican government action, it is clear that the Manhattan residence of her sister-in-law was the Empress' "actual abode" as well as her "last known residence" at the time (cf. *Feinstein v Bergner,* 48 NY2d 234, 241; CPLR 308, subd 2). As to the Shah, mailed service upon him at both New York Hospital and the address where his wife was temporarily residing in Manhattan was in effect substituted service upon him "at his last known residence", as directed by the Supreme Court order (CPLR 308, subd 5; 308, subd 2), as permanent a residence as he then had anywhere. The form of service authorized by the Supreme Court was reasonably calculated to give defendant notice of the lawsuit and an opportunity to be heard (*Dobkin v Chapman,* 21 NY2d 490, 501, 505). Moreover, the announced decision of the Mexican government on November 29 obviated the possible necessity of service by mail to the defendants' last known address in Mexico, where they had resided from June through October.*

---

\* The Shah never did return to Mexico. Defendants departed for Panama, by way of Texas, in December, 1979, and were eventually given safe haven in Egypt, where the Shah died in July, 1980.

This was not a case of fortuitous transitory presence. Defendants came here voluntarily. They had been in the State for almost 40 days before service was effected upon them. Their physical presence was sufficient for personal jurisdiction (*Hanson v Denckla,* 357 US 235; *International Shoe Co. v Washington,* 326 US 310, 316; *Pennoyer v Neff,* 95 US 714). Moreover they had no other "last known residence".

It is not too clear from the majority opinion whether it is premised, in part at least, upon the conclusion that there is an absence of personal or subject matter jurisdiction. However, that issue is not really here. The appeal we decide relates to *forum non conveniens.* It is well settled that a motion to dismiss for *forum non conveniens* presumes jurisdiction (*Bader & Bader v Ford,* 66 AD2d 642, 647, app dsmd 48 NY2d 649; *Silver v Great Amer. Ins. Co.,* 29 NY2d 356; *Varkonyi v S. A. Empresa De Viacao Airea Rio Grandense* [*Varig*], 22 NY2d 333; *Gulf Oil Corp. v Gilbert,* 330 US 501).

Moreover, Special Term, in the order appealed from, concluded that there was personal and subject matter jurisdiction. Plaintiff, the sole appellant, obviously does not appeal from that determination. The concurring opinion acknowledges such jurisdiction. Hence the significance of the discussion of domicile in the majority opinion does not appear. Although the majority opinion disclaims knowledge of Iranian law, it concludes that the Shah and the Empress are domiciliaries of Iran. How a person who has in effect been exiled from his or her country is still domiciled in that country for any legal purpose does not appear, and, in any event, is irrelevant. The issue is jurisdiction, which does not depend upon domicile. Nevertheless, the death of the Shah prior to decision on the dismissal motion should have resulted in action toward appropriate substitution before the decision was rendered.

CPLR 1015 (subd [a]) provides: "If a party dies and the claim for or against him is not thereby extinguished the court shall order substitution of the proper parties." Special Term, in denying the Shah's removal as a party

defendant, acknowledged that the Shah's death did not extinguish the claims against him. But where timely substitution has not been made in the wake of the death of a party defendant, the court should entertain an appropriate motion for substitution by appointment of a representative, even at the behest of the plaintiff, or by an application by order to show cause why the action should not be dismissed as to that defendant (CPLR 1015, subd [a]; 1021; see McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1021:2, p 224). There should be a remand for that purpose. (*Mazzeo v Marrone*, 46 AD2d 788; *Turner v Milligan*, 37 AD2d 896.)

The Empress argues for dismissal for lack of subject matter jurisdiction under the political question doctrine. It requires no feat of memory to be reminded of those dark and sordid days when plaintiff's surrogates, in a cruel reign of terror, deprived American citizens of their freedom under conditions devoid of any semblance of respect for their persons and their rights and in complete disregard of international law. But access to our courts of law has never been based upon the good character of the complainant. The same standards of subject matter jurisdiction are applied to all who seek to litigate here, no matter how repulsive their conduct may be. Only in this way will justice truly be served. The fact that plaintiff, whose leaders have recently heaped such scorn upon the institutions of this Nation, has chosen to press its claims in the courts of New York is not without irony. This lawsuit is itself a mark of the reputation of our courts in the international community for fairness and objectivity. The question of plaintiff's unclean hands is better left to the court which will hear the merits of plaintiff's claim for equitable relief. The effrontery of plaintiff in instituting this lawsuit in our courts, at the very moment that it was holding our citizens hostage, needs no further comment. The irony is plain.

While courts generally defer to the executive branch of government on purely political questions, not every issue with political overtones will divest the court of jurisdiction. It is still the judiciary's function to resolve issues of law, "regardless of the political context in which such questions arise." (*Matter of Anderson v Krupsak*, 40 NY2d 397, 404.)

We are not called upon here to pass judgment upon a quarter century of American foreign policy toward Iran, nor does this action necessarily concern internal Iranian politics. Rather, this case appears to raise traditional questions of law and fact, the merits of which need not be touched upon here. Regardless of the political context, issues of conversion, misappropriation and breach of fiduciary duty do not involve political dogma so as to divest the court of jurisdiction. In essence, these are the claims alleged, even though it is asserted that the funds in question were unlawfully taken from the government of Iran and its people.

Whether the law of Iran ever contemplated a suit against the Shah for misconduct may very well be an appropriate subject of a motion to dismiss upon the ground that the complaint fails to state a cause of action cognizable in our courts. This has nothing to do with *forum non conveniens.*

As Special Term noted, after the agreement between the United States and Iran, providing, *inter alia,* for the release of the hostages, had been signed and after the Reagan administration had an opportunity to review it, the United States announced that it had agreed in point IV, paragraph 12 of the agreement, in part, as follows: "The United States will freeze and prohibit any transfer of property and assets in the United States within the control of the estate of the former Shah or any close relative of the former Shah served as a defendant in U.S. litigation brought by Iran to recover such property and assets as belonging to Iran. As to any such defendant including the estate of the former Shah, the freeze order will remain in effect until such litigation is finally terminated." The agreement further provided: "The United States will make known, to all appropriate U.S. courts, that in any litigation of the kind described in paragraph 12 above the claims of Iran should not be considered legally barred either by sovereign immunity purposes or by the act of state doctrine".

This agreement and procedure was in accordance with Executive Order 12284 (46 Fed Reg 7929), issued by President Carter on January 19, 1981, obviously designed to recognize our courts' jurisdiction to entertain such proceed-

ings. Of course, such an agreement cannot impose jurisdiction on the courts of New York State where jurisdiction over the person or subject matter is lacking, or where no cause of action cognizable under our law is stated, or even where *forum non conveniens* requires dismissal.

In essence, the majority are making a political judgment, while disclaiming the "political thicket". As stated by Special Term:

"However complex and pervasive the political aspects of the recent history of Iran may be, it cannot be said that this case is so political in nature as to be 'manifestly nonjusticiable' as alleged by the defendants. When the elements of rhetoric in the complaint are pared away, what remains are causes of action to impress a trust, for an accounting, for an injunction against the transfer of property and for damages. These claims are not political in nature. They are clearly cognizable under the law of this state and are justiciable in our courts.

"In *Baker v. Carr*, 369 U.S. 186, the Supreme Court commented on cases involving political issues: 'Yet it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.'

"Such an analysis here leads to the conclusion that the issues raised by the complaint are not political issues, but are issues of law involving political entities. These are issues for resolution by the Judicial branch of our government which are not susceptible to resolution by the Executive or Legislative branches.

"The complaint cannot be dismissed under sovereign immunity principles or the Act of State doctrine by express mandate of the terms of the hostage release agreement. Nor will the Court dismiss this action on the ground that it encompasses purely political questions."

Whether the various kings and monarchs described in the majority opinion would or should have had access to our courts or whether they were subject to the jurisdiction of our courts has nothing to do with the issue of *forum non conveniens*, now here. It may well be, as the majority suggests, that a revolutionary regime may not be heard in our courts to pursue assets of their country in the hands of former rulers. That question relates to whether a cause of action is stated, which is not now before the court. Interestingly enough, the majority, disclaiming any knowledge of Iranian law, concludes that the Iranian courts are incapable of dealing with the issues now here. Whether that is so is not involved in the issue of *forum non conveniens*.

The doctrine of *forum non conveniens* presupposes the existence of at least two forums in which the defendant is amenable to process (*Gulf Oil Corp. v Gilbert*, 330 US 501, 506-507, *supra*) — the one in which the action was commenced and the one which is supposedly more convenient for resolving the dispute. One of the essential factors for consideration by the court is the availability of an alternative forum where the plaintiff may obtain effective redress (*Varkonyi v S. A. Empresa De Viacao Airea Rio Grandense* [*Varig*], 22 NY2d 333, *supra*). The burden is on the defendant to establish the availability of a more convenient alternative forum for hearing the case. "The party who seeks to invoke *forum non conveniens* to effect dismissal of the action and eventual transfer to another jurisdiction must clearly establish that New York is an inconvenient forum and that another is available which will best serve the ends of justice and the convenience of the parties." (*Bader & Bader v Ford*, 66 AD2d 642, 645, app dsmd 48 NY2d 649, *supra*.)

In effect the majority is suggesting that defendants should be offering Iran as an alternate forum, which a motion to dismiss under *forum non conveniens* requires. Palpably no such offering is now, or ever will be forthcoming, and it would be inappropriate for this court to so direct.

As Special Term stated: "Iran is the logical forum for this litigation. Certainly it is a more convenient forum for the plaintiff Islamic Republic than New York, for the reasons

set forth supra concerning the law to be applied and the availability of evidence. Iran is not necessarily a convenient or adequate forum for the Empress and the Shah's estate, in light of the political upheaval there following the defendant's departure in 1979."

The Empress obviously will not consent to confer jurisdiction upon the courts of Iran, in the interest of self-preservation. But she has failed to identify a more appropriate alternative forum. Special Term's suggestion that the dispute be adjudicated in some international forum such as before an international arbitral tribunal, of the type contemplated in the resolution of the hostage crisis, is at best speculative. The Empress' burden extends to identifying an appropriate forum presently in existence. Her failure to do so leaves New York as a logical choice, considering the late Shah's apparently extensive financial dealings here.

The concurring opinion concludes that the action should be dismissed because the court has inherent power to decline to exercise jurisdiction in the interest of justice, where exceptional circumstances exist, even though no other forum is shown to be available. However, the authorities relied upon are to the contrary. In *Gulf Oil Corp. v Gilbert* (*supra*) the Federal District Court had jurisdiction based on diversity of citizenship. All events giving rise to the litigation had occurred in Virginia. Most of the witnesses resided there. Finding that both State and Federal courts in Virginia were available to the plaintiff, and the defendant was amenable to jurisdiction there, the United States Supreme Court in discussing the court's inherent power expressly stated (330 US, at pp 506-507): "In all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them." It is this doctrine which hitherto was dispositive.

In *Canada Malting Co. v Paterson Co.* (285 US 413) also relied on by the concurring opinion, two ships of Canadian registry and ownership, carrying cargo shipped from one Canadian port to another, collided on Lake Superior while unintentionally in United States waters. One ship sank.

All the parties were citizens of Canada and the officers and crew of each vessel were citizens and residents of Canada. While a suit was pending in a Canadian court to determine liability as between the ships, libels in personam against the owner of one of them were filed by cargo owners in a Federal District Court in New York. It was held that the action should be dismissed on ground of *forum non conveniens,* provided respondent appeared and filed security in any action which might be instituted by the libelants in the Admiralty Courts of Canada. It was in this context that Mr. Justice BRANDEIS, writing for the Supreme Court, stated (285 US, at pp 422-423): "Obviously, the proposition that a court having jurisdiction must exercise it, is not universally true; else the admiralty court could never decline jurisdiction on the ground that the litigation is between foreigners. Nor is it true of courts administering other systems of our law. Courts of equity and of law also occasionally decline, in the interest of justice, to exercise jurisdiction, where the suit is between aliens or non-residents or where for kindred reasons the litigation can more appropriately be conducted in a foreign tribunal."

*Noto v Cia Secula di Armanento* (310 F Supp 639) also relied on in the concurring opinion, was a suit between aliens, arising from an explosion of a tanker in an Iranian port. In declining to exercise jurisdiction the court found another forum was available, expressly stating (310 F Supp, at p 650): "Finally, to decline jurisdiction in these actions deprives plaintiffs of no rights. Their claims can be litigated upon the merits in Italy, their own country, since a five-year statute of limitations applies. Cosarma, a corporation of Italy, is subject to jurisdiction there if plaintiffs decide to sue. Additionally, the active alleged tortfeasors, Cosarma, IOEP, NIOC and BP Tanker, are engaged in litigation before the Tribunal of Rome, wherein each seeks to cast liability upon another for the LUISA disaster. Since plaintiffs' claims are based upon the tortious acts that are the subject of that litigation, under Italian law they may intervene and thus acquire jurisdiction over the non-Italian corporations. Plaintiffs are also in a position to assert their claims against Cosarma in an action commenced

against them by the latter in the Tribunal of Venice for a declaratory judgment that it is not liable to them."

It is plain that *forum non conveniens* was held to be applicable in these cases because there was another forum available to dispose of the litigation.

On this motion we need not concern ourselves with the question of what standard should guide the court in passing judgment on the perquisites of an emperor. If that becomes an issue on the trial of this case, the Trial Judge will know how to deal with it. The issue is not whether this court is called upon to serve as a paymaster of the spoils of empire or as referee between dictators, as suggested in the concurring opinion. The issue is whether the present government of Iran, however much we detest it, has a right to sue in our courts to recover from the former emperor Iranian assets which it asserts he unlawfully converted. The authorities relied upon in the concurring opinion are plainly not in point.

In *Stone v Freeman* (298 NY 268), an action by a seller of goods against a broker to recover that portion of the commission paid to the broker which the seller had agreed was to be paid to the buyer's purchasing agent, the contract was held to be illegal and unenforceable. It is in this context that the court wrote (298 NY, at p 271): "For no court should be required to serve as paymaster of the wages of crime, or referee between thieves. Therefore, the law 'will not extend its aid to either of the parties' or 'listen to their complaints against each other, but will leave them where their own acts have placed them' (*Schermerhorn* v. *Talman,* 14 N.Y. 93, 141). Conforming to that settled rule, this court and its predecessor have several times held that when an agent receives money to be spent for illegal purposes, his principal may not recover back so much of that money as the agent has failed so to spend, particularly when the illegal purpose has been partly or wholly attained and a part of the money expended therefor". *Flegenheimer v Brogan* (284 NY 268), also relied on in the concurring opinion, is similar. The court declined to enforce a contract on behalf of the estate of a decedent who had placed the stock of a corporation in the name of a dummy in order to avoid the licensing laws in connection with the sale of liquor. Decedent would not have been able

to obtain a license because of his record. The court held that an answer was sufficient which alleged that the organization of the corporation and the issuance of its capital stock in the name of the dummy "were part and parcel of a fraudulent plan, contrivance and scheme to keep secret from the Federal and State authorities the identity of plaintiff's intestate as the true undisclosed owner and operator * * * for the purpose of inducing Federal and State authorities to issue permits for the manufacture and sale of beer and ales at said brewery". Defendant had no knowledge of the interest of plaintiff's intestate in the brewery or its capital stock when defendant purchased the same from the dummy. The court held that the transactions were so far against the public good as to disable the plaintiff from invoking the aid of the court in her endeavor to disengage herself from the unlawful conduct of her intestate. Plainly, this has nothing to do with *forum non conveniens* nor with the right of plaintiff to assert that the former emperor unlawfully converted Iranian funds.

It may well be that on the trial of the action the answer to some of these questions will preclude recovery. This has nothing to do with whether we should entertain jurisdiction and even less to do with whether the doctrine of *forum non conveniens* requires that we decline jurisdiction.

Plaintiff's unclean hands are not relevant on the issue of *forum non conveniens,* although perhaps appropriate to a determination on the merits of the action. Moreover, they do not directly relate to the subject matter in litigation (see *National Distillers & Chem. Corp. v Seyopp Corp.,* 17 NY2d 12, 15-16). The burden on our courts, albeit heavy, must be assumed, jurisdiction having been obtained and no other forum being available.

Much of the majority opinion relates to the enforceability of any judgment obtained in Iran, and whether, under the Uniform Foreign Money-Judgments Recognition Act (CPLR art 53), such a judgment might be enforceable. That has nothing to do with the issue now here. We are not asked to enforce an Iranian judgment in this action, albeit the treaty between the United States and Iran, above

referenced, provides that such judgments "should be enforced by such courts in accordance with United States law."

New York will discharge its limited responsibility to provide a system of justice applicable to this dispute when it opens its door to the litigation, so that the issue of whether cognizable claims are stated may be litigated on a motion addressed to the substance of the complaint and not on a procedural motion, such as *forum non conveniens.*

Accordingly, the order granting defendants' motion to dismiss on the ground of *forum non conveniens,* denying defendants' motion to dismiss on grounds of lack of personal and subject matter jurisdiction, and denying defendant Farah Diba Pahlavi's motion to amend the caption, should be modified on the law and the facts and in the exercise of discretion as to defendant Farah Diba Pahlavi by denying her motion to dismiss on the ground of *forum non conveniens* and otherwise affirming, without costs, and as to defendant Mohammed Reza Pahlavi by remanding to Special Term for further proceedings pursuant to CPLR 1015 (subd [a]) and 1021.

CARRO and MILONAS, JJ., concur with SILVERMAN, J.; KUPFERMAN, J. P., concurs in an opinion; FEIN, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on November 20, 1981, affirmed. Defendant-respondent-appellant shall recover of plaintiff-appellant-respondent $75 costs and disbursements of this appeal.