The REPUBLIC OF the PHILIPPINES,
Plaintiff/Appellee,

v.

Ferdinand E. MARCOS, Imelda R. Marcos, Ramon Azurin, Diosdado C. Ordonez and Ancor Holdings, N.V., Defendants/Appellants.

Nos. 86–6091, 86–6093.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 3, 1986.

Decided June 4, 1987.

As Amended June 24, 1987.

Ronald L. Olson, Richard B. Kendall, Los Angeles, Cal., for plaintiff/appellee.

Gerald Walpin, Lawrence G. Golde, Dorothy Heyl, New York City, Richard A. Hibey, Washington, D.C., for defendants/appellants.

Before NELSON, HALL and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

We review a preliminary injunction entered against the former president of the Philippines, his wife, several of their associates, corporations allegedly controlled by some or all of them, and a bank where Mrs. Marcos has an account.

## Facts

### A. Background

On February 7, 1986, a special presidential election was held in the Philippines. There were allegations of massive fraud against the existing government and outbreaks of violence against those supporting the opposition. The precise vote count may never be known, but the official tabulation, which showed an overwhelming victory for Ferdinand Marcos, was rejected by the Philippine people. On February 25, 1986, realizing perhaps that his regime was nearing its end, Marcos and his wife left. His successor, President Corazon Aquino, was almost immediately recognized by our government as the legitimate leader of the Philippines. N.Y. Times, Feb. 26, 1986, at 1, col. 3.

When the Marcoses arrived in Hawaii, they brought along numerous crates filled with currency, jewels, precious metals and negotiable instruments. These crates were impounded by the United States Customs Service. Litigation began. On February 28, the Central Bank of the Philippines sued in the United States District Court for the District of Hawaii, seeking the return of 22 crates full of Philippine currency. On March 13, the Marcoses' agents petitioned for a writ of mandamus against the Commissioner of Customs, seeking the release of all the crates. On March 21, the Central Bank sued for the return of all the crates or their monetary equivalent. All these actions were consolidated in Hawaii. The mandamus suit against the Commissioner of Customs was decided, on an expedited basis, against the Commissioner, then reversed by another panel of this court. *Azurin v. Von Raab*, 803 F.2d 993 (9th Cir.1986).

Assets allegedly belonging to the Marcoses, or held for their benefit, began to turn up around the world. The Republic of the Philippines (the Republic) has begun litigation in Switzerland, state and federal courts in California, and federal courts in New York, New Jersey and Texas. In each case, the Republic is trying to recover or freeze specific assets that it regards as property of the Philippines improperly possessed or controlled by the Marcoses.

### B. The Complaint

The complaint in this case was filed on June 16, 1986. Unlike the cases filed in other jurisdictions, *e.g., Republic of the Philippines v. Marcos*, 806 F.2d 344, 361 (2d Cir.1986), this one does not simply seek the recovery or freezing of specific property. Instead, it alleges that during his tenure as president of the Philippines, Marcos committed depredations that enabled him to gain enormous riches at the expense of the Republic and its citizens. Raising various federal and state law claims, the Republic seeks to have all or part of this wealth returned; it also seeks $50 billion in punitive damages.

The thrust of the Republic's claim is that the Marcoses abused their authority, depriving the Philippines and its people of wealth that is rightfully theirs. Paragraph 12 of the complaint charges that "Mr. Marcos used his position of power and authority to convert and cause to be converted, to his use and that of his friends, family, and associates, money, funds, and property belonging to the Philippines and its people." This allegation is incorporated into, and forms the basis of, every claim for relief in the complaint. In addition, plaintiff alleges as follows:

[T]he Philippines existed as a sovereign government and thus constituted a RICO "enterprise".... Defendants conducted or participated ... in the conduct of the affairs of the Philippines through a pattern of racketeering activity.... [Complaint ¶¶ 28, 29(a).]

Mr. Marcos represented on countless occasions to the Philippines and its people that he was governing and would govern fairly and honestly, pursuant to his oath of office and the Constitution and Laws of the Philippines. He further made numerous and frequent declarations to his people that he had never taken money, property, or funds belonging to the Philippines or its people for his own personal use, nor that of his friends, family and associates. [Id. ¶ 49.]

Mrs. Marcos [as Governor of Manila] made similar representations of honesty, integrity and willingness to act within and not above the laws to the people of the Philippines residing in Manila. [Id. ¶ 50.]

[The Marcoses] intended that the Philippines and its people rely on these misrepresentations and thereby permit Mr. and Mrs. Marcos to remain in power and positions of authority. [Id. ¶ 51.]

They further intended that the people of the Philippines would be deceived and not realize that Mr. and Mrs. Marcos, and their accomplices, family, and associates were plundering the wealth of the country to enrich themselves at the expense of the Philippines and its people. [Id.]

Plaintiff [the Republic] relied to its detriment on the representations of Mr. and Mrs. Marcos, and their accomplices, by permitting them to remain in positions of power and authority for twenty years and by allowing, through ignorance, the plunder of the country. [Id. at ¶ 52.]

Mr. Marcos as President, and Mrs. Marcos as Governor of Manila, occupied positions of trust and confidence as to the government and people of the Philippines. [Id. at ¶ 57.]

Mr. and Mrs. Marcos breached that trust and confidence by committing numerous acts of fraud, deceit, conversion, civil conspiracy, acts of racketeering, and other unlawful acts [and that as a consequence thereof plaintiff] permitted them to remain in positions of power and to conduct the affairs of the Philippines virtually unchecked. [Id. ¶¶ 58–59.]

Mr. and Mrs. Marcos, by virtue of their position [sic] as President of the Philippines and Governor of Manila, respectively, occupied positions of trust as to the Philippines and its people. [Id. ¶ 62.]

[Before] Mr. Marcos assumed the office of President of the Philippines ... he took the Oath of Office.... By accepting the duties and obligations imposed by the oath, in consideration for the remuneration ... provided by Philippine law, Mr. Marcos entered into an implied contract with the Philippine government to use the power of the Presidency according to law, in good faith, and not for personal aggrandizement. [Id. ¶¶ 71–72.]

The complaint also alleges that during Marcos' rule, he and his wife converted and caused to be converted property worth $1.55 billion belonging to the Philippine government and its citizens. Most of this, approximately $1.5 billion, allegedly went into Swiss bank accounts; four million dollars went to buy a house in Beverly Hills; some $800,000 went into two bank accounts at Lloyds Bank in California; and property worth $7 million is in the Hawaii crates.

Only Ferdinand and Imelda Marcos are charged with having participated in all of these transactions. Defendants Ramon Azurin and Gregorio Araneta are alleged to have been the Marcoses' agents for bringing the crates of money and jewelry into Hawaii. Defendants Antonio Floriendo, Diosdado Ordonez, Calno Holdings N.V., Krodo Properties N.V., and Al Djebel Corp. (collectively the "minor defendants") partic-

ipated only in the acquisition and holding of the Beverly Hills property. Lloyds Bank was named as a defendant only because it held the two accounts in the name of Mrs. Marcos. There are no specific allegations of wrongdoing against Ancor Holdings, Inc.

On this foundation, the Republic strives to build eleven claims. Only the first three, based on the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1982), are grounded on federal law; the remainder are pendent. The first RICO claim charges the Marcoses and the minor defendants with conducting a RICO enterprise, consisting either of the Philippine government itself or, alternatively, of an association-in-fact made up of the defendants with an existence apart from the racketeering activity in which they allegedly engaged. The specific activities alleged are: (a) the transfer, by mail and wire, of converted funds, which the Republic claims amounted to mail or wire fraud; (b) the transportation of the crates to Hawaii, which the Republic claims was the knowing transportation of stolen goods in foreign commerce; (c) the acquisition of the Beverly Hills property by Calno (later transferred to Krodo and Al Djebel) with funds that the Republic claims were stolen, and so known to be by all the defendants involved; (d) the knowing concealment of stolen goods moved in foreign commerce; and (e) the sale of a deed of trust to the Beverly Hills property (part of Calno's disposition of the property) knowing that the deed was stolen or taken by fraud.

The second federal claim charges investments of funds produced by racketeering into two "enterprises": the Beverly Hills property and the Lloyds Bank accounts. The third claim alleges a conspiracy among the defendants to conduct the RICO enterprise and invest the funds.

The remainder of the complaint propounds various state law theories of recovery on the same allegations of fact. They include, in particular, requests that the court impose a constructive trust on the disputed assets and require an accounting of the defendants.

## C. District Court Proceedings

The Republic moved for a preliminary injunction to prevent the transfer of property held anywhere in the world by or on behalf of the Marcoses. On June 25, 1986, the district court granted the injunction. It held that RICO established a basis for federal jurisdiction and the pendent causes of action entitled the Republic to an injunction. The court based the preliminary injunction on the pendent claims for constructive trust and accounting, finding that the Republic had a substantial likelihood of prevailing. It also found that the Marcoses' alleged propensity to move assets would irreparably harm the Republic if the injunction were not granted. The Republic had made no attempt to win an attachment of any assets and the district court held that it was not required to do so.

Defendants appeal, raising four major contentions. First, they argue that the district court had no jurisdiction over this action. They contend that the RICO claims are so remote as to be frivolous. Second, they argue that even if plaintiff has made a colorable claim sufficient to establish subject matter jurisdiction, the district court abused its discretion by issuing the injunction. They argue that the plaintiff's case is just too weak, particularly when their likely affirmative defenses are considered, to support a finding that it will probably succeed on the merits. Third, defendants argue that the injunction was improvidently granted because the Republic will not sustain irreparable harm if the injunction is dissolved, the Marcoses having agreed to a freeze of their assets for the Republic to litigate the case in the Philippines. Finally, defendants contend that, in any case, the injunction—covering the Marcoses' property worldwide—is far too broad, sweeping in a multitude of assets that have no connection to the pendent state law claims.

### Discussion

■ A district court may grant a preliminary injunction when the movant demonstrates probable success on the merits and the possibility of irreparable injury. *San Diego Comm. Against Registration & the Draft v. Governing Bd.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986). Where the balance of relative hardships "tips decidedly toward the plaintiff," however, "the plaintiff need not show as robust a likelihood of success on the merits." *Benda v. Grand Lodge of the Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dis-*

*missed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). As often noted, preliminary injunctions may be issued at any point on a continuum along which the likelihood of success varies inversely with the potential of harm to the plaintiff. *Id.* In this case, the district court based its decision to grant a preliminary injunction on its conclusion that the Philippines had a substantial likelihood of success on both its RICO and pendent state claims, and that there was a "substantial danger" of irreparable harm. The court made no findings on the balance of relative hardships necessary to support an injunction at the opposite end of the spectrum.

█ The grant of a preliminary injunction may be reversed if the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984). Legal issues underlying the preliminary injunction decision are reviewed de novo. *International Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir.1986).

## I.

## SUBJECT MATTER JURISDICTION

█ The defendants contend that the Republic's RICO claims are so frivolous that they cannot form the basis of jurisdiction in the district court. But we view jurisdictional claims under an exceedingly generous standard at this stage of the proceedings. As we stated in *Keniston v. Roberts,* 717 F.2d 1295, 1298 (9th Cir.1983), "the complaint must fulfill only two criteria: (1) it must 'claim a right to recover under the Constitution and laws of the United States,' and (2) the claim must not be 'wholly insubstantial and frivolous.' *Jackson Transit Authority v. Local Division 1285,* 457 U.S. 15, 21 n. 6 [102 S.Ct. 2202, 2206 n. 6, 72 L.Ed.2d 639] (1982) (*quoting Bell v. Hood,* 327 U.S. 678, 681, 682–83 [66 S.Ct. 773, 775, 776, 90 L.Ed. 939] (1946))."

█ While generous, this standard is not toothless. We regularly uphold the dismissal of claims where they are so insubstantial that the district court plainly lacks jurisdiction. *See, e.g., Ellis v. Cassidy,* 625 F.2d 227 (9th Cir.1980); *Standage Ventures, Inc. v. Arizona,* 499 F.2d 248 (9th Cir.1974). However, we deem claims insubstantial only where the law is clear or where a plaintiff has persistently failed to allege an essential element. Under this narrow standard, we cannot conclude that all the RICO claims made by plaintiff here are frivolous. The law is neither so clear, nor are the allegations of the complaint so patently and irremediably defective, that we can say with confidence that plaintiff has failed to establish a colorable basis for jurisdiction in the district court. Assuming the truth of the matters alleged in the complaint, as we must, we find all of the elements of a RICO violation: the existence of a criminal enterprise, Complaint ¶¶ 28, 29(b); the conduct of its affairs through a pattern of racketeering activity, *id.* ¶¶ 29(a), 29(c), 30; and injury caused thereby, ¶ 32. Plaintiff's complaint seems to allege at least prima facie RICO violations by the Marcoses.[1]

█ Where, as here, plaintiff's claim is based upon transactions that take place fully or partly outside the United States, we must make one further inquiry: whether our law was meant to reach the conduct in question insofar as it is extraterritorial in nature. *See, e.g., SEC v. United Financial Group, Inc.,* 474 F.2d 354, 355 (9th Cir.1973); *Des Brisay v. Goldfield Corp.,* 549 F.2d 133, 135 (9th Cir.1977). Here the alleged thefts by Mr. Marcos and his confederates took place in the Philippines and quite probably that conduct cannot be reached by U.S. law. However, plaintiff does not base its claim directly upon the alleged thefts in the Philippines. Its claim is based upon conduct that it charges took place in the United States: mail fraud and transportation of stolen property across international borders in violation of 18 U.S.C. §§ 1341, 1343, 2314, 2315.

---

1. The minor defendants, in addition to being accused of participating in some of the specific instances of racketeering, are all charged with conspiracy to violate RICO. 18 U.S.C. § 1962(d). The complaint specifically alleges an agreement to violate the law and describes several alleged overt acts that furthered the conspiracy. There is thus a prima facie case sustaining jurisdiction over the minor defendants as well.

■ Assuming that the property in question is in fact stolen, the charged acts—all of which took place within the United States—would clearly violate U.S. law. Again, assuming that the allegations of the complaint are true, the violations appear to be sufficient predicate acts under RICO. When all is said and done, it may well prove otherwise. But at this early stage of the proceedings, where predicate acts are alleged to have been committed within the United States, we cannot say that the district court was without jurisdiction to entertain plaintiff's RICO claims.

## II.

## PROBABILITY OF SUCCESS ON THE MERITS

### A.

This is a highly unusual case. The current government of a friendly foreign nation is pursuing that nation's former ruler, seeking to litigate in our courts the legality of his actions during more than 20 years in office. While Mr. Marcos had the title of president he was, in the words of Rafael Fernando, the West Coast representative of the Philippine Commission on Good Government, "the dictator of the Government of the Philippines and personally controlled the said government." Declaration of Rafael Fernando in Support of Temporary Restraining Order and Order to Show Cause (Fernando) ¶ 7. During much of Mr. Marcos' tenure in office, he governed by decree under a regime of martial law. *Id.* As plaintiff alleges, during this time the Marcoses were able "to conduct the affairs of the Philippines virtually unchecked." Complaint ¶ 59.

A few of Marcos' alleged misdeeds, as charged in the complaint and the Fernando declaration, may amount to nothing more than common fraud or theft accomplished without the exercise of governmental authority. But the vast majority of the allegedly illegal acts are quite different in character; they are activities that Marcos could only have undertaken pursuant to his powers as President of the Philippines: expro-

priation of private property; creating public monopolies; "grant[ing] government favors, contracts, licenses, loans, and other public benefits." Fernando ¶ 8. In this regard, perhaps the most telling aspect of plaintiff's case is its first claim for relief. Plaintiff there alleges that "the Philippines existed as a sovereign government and thus constituted a RICO 'enterprise' within the meaning of 18 U.S.C. § 1961(4)" and that "[d]efendants conducted, or participated directly or indirectly in the conduct of the affairs of the Philippines through a pattern of racketeering activity...." Complaint ¶¶ 28, 29. Plaintiff is thus claiming that the Philippine government headed by Marcos was a criminal enterprise under U.S. law.[2]

Moreover, plaintiff presents issues that are different in character, not merely in degree, from the normal case brought under RICO and the various state causes of action. Thus, paragraph 72 of the Complaint puts squarely in issue the manner in which Mr. Marcos discharged his responsibilities as President of the Philippines. Citing the oath of office Mr. Marcos took in 1965, plaintiff charges that he "entered into an implied contract with the Philippine government to use the power of the Presidency according to law, in good faith, and not for personal aggrandizement." Paragraph 73 then charges that "Mr. Marcos breached this contract."

Paragraph 51 of the complaint charges that Mr. and Mrs. Marcos made numerous misrepresentations "to the Philippines and its people," with the result that they were allowed "to remain in power and positions of authority." Paragraph 52 charges that "[p]laintiff relied to its detriment on [these misrepresentations], by permitting them to remain in positions of power and authority for twenty years and by allowing, through ignorance, the plunder of the country." Mr. Fernando, in his declaration, charges that the "amounts purloined by Mr. Marcos are of such significance as to affect the general economic conditions of the Republic of the Philippines and its people." Fernando ¶ 8.

2. The Republic alleges in the alternative that the defendants, except Lloyds Bank, were part of an association in fact. But under either theory, the Republic alleges that the defendants conducted the affairs of the Philippines for their own benefit, and urges us to examine closely the conduct of that government in the past to decide the motivations for its actions.

Plaintiff's case is a ringing indictment of Mr. Marcos' conduct as President of the Philippines during his 20 years in office. As such, it challenges not merely individual misdeeds or indiscretions but the very way in which Mr. Marcos wielded governmental power, retained that power and ran the Philippine government. This raises a variety of serious and sensitive questions about the ability of our courts to adjudicate this issue, and the propriety of their doing so. In effect, we must consider whether our courts are the appropriate forum for adjudicating what appears to be at least in part a political dispute between the Philippines' current government and its former ruler.

### B.

 Our jurisdiction in this case is based solely on RICO, a statute that does not authorize the court to grant injunctive relief. *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1088–89 (9th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). Thus, as the district court properly recognized, if an injunction is to be issued at all, it must be on the basis of the pendent state claims. Nevertheless, probability of success on the RICO claims is not entirely irrelevant. The purpose of a preliminary injunction is to preserve the court's power to render meaningful relief after a trial on the merits. 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2947 (1973). If the federal claims are exceedingly weak, or subject to meritorious affirmative defenses, they are likely to succumb to a motion to dismiss or an early motion for summary judgment. In that event, the pendent state claims may well be subject to dismissal also. *See, e.g., Kelley v. IBEW,* 803 F.2d 516, 519 (9th Cir.1986); *Arizona v. Cook Paint & Varnish Co.,* 541 F.2d 226, 227–28 (9th Cir. 1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977) (court may not reach out to decide state law claims if court and litigants have not already spent considerable time and effort on the case).

For purposes of our discussion, we need not, however, differentiate between the state and federal causes of action because all of plaintiff's claims hinge on certain key allegations of the complaint. *See* pp. 1474–75, *supra.* Although these allegations are made in elaborate detail, they have one common nucleus: Plaintiff is claiming that the Marcoses (with the help of their confederates) acquired substantially all of their wealth illegally. Thus, in order to establish the requisite predicate acts in the United States for purposes of RICO—mail fraud, wire fraud, transportation of stolen property—plaintiff must be able to show that the assets in question were in fact stolen or that the transactions involving wire and the mails involved property to which neither the Marcoses nor their confederates were legally entitled. Similarly, to establish a constructive trust under California law, plaintiff must show that the property in question was gained by "fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act." Cal.Civ.Code § 2224 (West App.1987). To be entitled to an accounting, plaintiff must show that the defendants acquired the assets by fraud. *K. King & G. Shuler Corp. v. King,* 259 Cal.App.2d 383, 396, 66 Cal. Rptr. 330, 338 (1968). If plaintiff cannot show that the property was obtained illegally, all of its claims—state and federal—will fail.

While plaintiff has made sweeping allegations of illegality, it has not attempted to match particular illegal acts with specific property in California or elsewhere. Instead, plaintiff relies on what it calls a "net worth" analysis to show that virtually all of the Marcoses' wealth was acquired illegally. Plaintiff asserts that Marcos had a net worth of $60,000 in 1966, a year after taking office; it claims that he now has a net worth over $1.5 billion. In the meantime, Marcos earned (and declared on his tax returns) income of some $337,000 from his salary as President of the Philippines. Plaintiff therefore argues that practically everything the Marcoses own must have been stolen and therefore belongs to the Philippines.

Plaintiff seeks to bolster this net worth analysis with the Fernando declaration. In his declaration, Mr. Fernando asserts that the Marcos presidency was marked by "widespread purloining of funds and properties which were and are the property of the Philippine government." Fernando ¶ 8. Describing the illegal activity, Mr. Fernando states:

> The said taking of Government properties was effected by a range of tech-

niques, including but not limited to accepting payments, bribes, kickbacks, interests in business ventures, and other things of value in exchange for the grant of government favors, contracts, licenses, franchises, loans, and other public benefits; expropriating outright private property for the benefit of persons beholden to or fronting for Mr. Marcos, the said expropriation being at times effected by violence or the threat of violence or incarceration; arranging loans by the Philippine Government to private parties beholden to and fronting for Mr. Marcos; direct raiding of the public treasury; diverting loans, credits and advances from other governments intended for use by the Philippine Government; creating public monopolies placed in the hands of persons beholden to and fronting for Mr. Marcos. The said actions of the defendants were in violation of the laws of the Republic prohibiting malversation and corrupt practices.

Fernando ¶ 8. Mr. Fernando provides no direct evidence to support this litany of offenses; his only knowledge of these "facts" comes from "countless newspaper and firsthand accounts" relating them. *Id.*

In order to succeed under its "net worth" theory, plaintiff must show that tracing is unnecessary because practically *all* of the Marcoses' wealth was obtained illegally. Plaintiff's theory breaks down if Marcos can show that he acquired a substantial portion of his wealth legally or if the court is unable to adjudicate the legality or illegality of a substantial portion of Marcos' acquisitions. In that case, plaintiff would have the burden of linking up specific acts of illegality with specific property, something plaintiff has not attempted.

We note, without addressing them, defendants' numerous challenges to the sufficiency of plaintiff's prima facie case.[3] We turn instead to what we consider to be the heart of this case: plaintiff's assertion, and the district court's assumption, that all of the Marcoses' wealth must have been stolen. Specifically, we consider whether plaintiff's multitudinous claims of illegality can all be adjudicated by the district court or whether, as Marcos strenuously contends, they are subject to dismissal under the related act of state and political question doctrines. If we determine that a substantial portion of Marcos' conduct is likely to be shielded by one or both of these doctrines, plaintiff's net worth theory would collapse, and with it its probability of success on the merits, at least insofar as its case is now framed.

### C.

■ In *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), the Court pronounced concisely the act of state doctrine: "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *See also Hatch v. Baez,* 7 Hun. 596, 599 (N.Y.App.Div.1876) ("by the universal comity of nations and the established rules of international law, the courts of one country are bound to abstain from sitting in judgment on the acts of another government done within its own territory"). Although the doctrine has been modified in the intervening years, *Underhill* still expresses its essence as it is applied in our courts today.[4]

■ As the Court explained in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 938, 11 L.Ed.2d 804 (1964), the doctrine has " 'constitutional' underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and imple-

---

**3.** Defendants contend the Republic failed adequately to allege each element of its prima facie RICO case: the commission of predicate offenses, the existence of a criminal enterprise, and its operation through a pattern of racketeering activity. They also contend that the plaintiff failed to allege the agreement required for a charge of conspiracy, and that the defendants' investments in this country were not investments in an "enterprise."

Defendants also contend that the Republic insufficiently alleged the fiduciary duty necessary to a claim for accounting, and the misappropriation of funds necessary for the imposition of a constructive trust.

**4.** As late as 1964, the Court noted that "[n]one of this Court's subsequent cases in which the act of state doctrine was directly or peripherally involved manifest any retreat from *Underhill.*" *Sabbatino,* 376 U.S. at 416, 84 S.Ct. at 934.

ment particular kinds of decisions in the area of international relations." The doctrine, as developed by precedent, expresses a strong sense that in questioning the validity of foreign acts of state the judiciary may hinder this country's international diplomacy and "embarrass the United States in the eyes of the world." *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1358 (9th Cir. 1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982).[5]

 Plaintiff's case implicates the act of state doctrine in its most fundamental sense. In order to resolve plaintiff's various claims against Marcos, the court will have to adjudicate whether Marcos' actions as President were lawful under Philippine law. A number of the acts plaintiff challenges are purely governmental ones, such as expropriation of property and creation of public monopolies. These were not merely the acts of Ferdinand Marcos, private citizen, while he happened to be president; they were an exercise of his authority as the country's head of state and, as such, were the sovereign acts of the Philippines. As the Second Circuit recently noted, to the extent that "Marcos's wealth was obtained through official expropriation decrees or public monopolies," they were public acts. *Marcos,* 806 F.2d at 359.[6]

Moreover, resolution of various issues raised by plaintiff could interfere with the conduct of foreign relations by the political branches of our government or otherwise entangle the judiciary in foreign affairs. Thus, it could well embarrass the United States for the court to hold, as plaintiff would have us do, that a foreign government that the United States recognized and considered its ally for many years, with which it entered into various treaties and otherwise had extensive dealings, was actually a criminal enterprise under our law. Also, this litigation may not be concluded for years. It is, therefore, difficult to predict what effects the court's ruling will have on the political situation in the Philippines or on our relations with that country at that time. Our decision will be relatively innocuous only if it is in favor of the plaintiff, if our government's attitude toward the Philippines is unchanged and if the current Philippine government is still in power.

Plaintiff nevertheless advances a variety of arguments to the effect that this doctrine is not applicable. We consider each of its contentions in turn.

1. Plaintiff first argues that, in the words of the district judge, "the court is [not] going to be asked to decide anything about the affairs of the government of the Philippines. The question is what did Mr. Marcos do with the assets and the property and the money that he shouldn't have done." Trans. June 16, 1986, at 19, E.R. at 84. In support of this argument, plaintiff cites *DeRoburt v. Gannett Co.,* 733 F.2d 701 (9th Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985); and *Sharon v. Time, Inc.,* 599 F.Supp. 538, 546 (S.D.N.Y.1985). Both cases were libel suits by officials of foreign governments challenging news reports alleging that they had engaged in misconduct in the course of doing their jobs. Both officials denied committing the misconduct and the only question presented was whether they had in fact done so. In holding that the act of state doctrine was inapplicable, the *DeRoburt* and *Sharon* courts noted that validity of the acts was not at issue since everyone agreed that the acts, if committed, were illegal.[7] The cases therefore resolved

---

5. The act of state doctrine applies with as much force to the state law claims as it does to those based on federal law. As the Court stated in *Oetjen v. Central Leather Co.,* 246 U.S. 297, 303, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918): "The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court ... [as it is in cases] in which claims for damages were based upon acts done in a foreign country...."

6. The dissent points out, quite correctly, that the defendants bear the burden of proving that conduct is covered by the act of state doctrine. Nelson Dissent at 1495. However, we base our analysis on plaintiff's own characterization of defendants' acts, power and status. *See* p. 1479 *supra.* In gauging the likelihood of success on the merits, we simply adopt plaintiff's view as to what the evidence is likely to show.

7. In *DeRoburt,* the act was the making of an illegal loan. 733 F.2d at 702. In *Sharon,* it was

themselves into a simple dispute about whether DeRoburt and Sharon in fact did what they were reported to have done. As the court noted in *Sharon*, "[t]he issue in this litigation is not whether such acts are valid, but whether they occurred." 599 F.Supp. at 546.

Our case is quite different. At issue is not merely whether Marcos did what he is alleged to have done, but whether it was legal for him to do so as the country's dictator. Or, to put the matter somewhat differently, plaintiff cannot establish that the Marcoses obtained all of their wealth illegally without calling into question the legality of many of Mr. Marcos' acts as President of the Philippines. Unlike the *DeRoburt* and *Sharon* courts, the district court here would have to pass on the validity of Mr. Marcos' acts, not merely determine whether he committed them.[8]

■ 2. Plaintiff next argues that the act of state doctrine is inapplicable because Marcos' acts, to the extent they were illegal under Philippine law, were ultra vires and therefore not *"public* acts ... [undertaken] in the exercise of *governmental* authority." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 706, 96 S.Ct. 1854, 1867, 48 L.Ed.2d 301 (1976) (opinion of White, Powell and Rehnquist, JJ., and Burger, C.J.) (emphasis in original).[9] This argument proves too much. Since the act of state doctrine prohibits inquiry into the legality of official governmental acts, such acts surely cannot be official only if they are legal. This theory, if accepted, would emasculate the act of state doctrine.

In *Banco de Espana v. Federal Reserve Bank*, 114 F.2d 438 (2d Cir.1940), the court rejected a similar request by a Spanish bank, backed by Spain's current government, seeking to set aside a transfer of silver bullion by an official of the country's prior government. Banco de Espana argued that the former Minister of Finance had been selling the silver in violation of Spanish law. The court refused to second-guess the legality of the Finance Minister's action, noting as follows:

> It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal. No such distinction may be gleaned from the cases. So long as the act is the act of the foreign sovereign, it matters not how grossly the sovereign has transgressed its own laws.

*Id.*, at 444. *See also Bernstein v. Van Heyghen Freres S.A.*, 163 F.2d 246, 249–50

---

abetting the massacre of civilian refugees in West Beirut after the Israeli invasion of Lebanon. 599 F.Supp. at 542–43.

8. In *DeRoburt* our court clearly drew this distinction. We approved the dismissal of the third amended complaint involving plaintiff's claims that "defendant falsely accused the Republic of Nauru of secretly backing the separation of the Marshall Islands from Micronesia, [and] of making an illegal loan to the Marshall Islands in 1974, and falsely accused himself of making secret and illegal loans to the Marshall Islands in 1974 and 1978." 733 F.2d at 703. We held that "litigation of those claims would involve serious intrusion into the propriety of the acts and policies of a foreign state and thus clearly call into play the act of state doctrine." *Id.*

9. Plaintiff also relies on a statement in *Sharon* to the effect that "a fairly stringent degree of formality may be required in proving [an officially authorized] act by a public official." 599 F.Supp. at 544. We reject this standard for three reasons. First, it was dictum. As discussed above, *Sharon* was simply not a case involving the validity of official acts; Judge Sofaer's ruminations as to how the doctrine would operate if it were applicable are interesting but beside the point. Second, the Second Circuit, in a recent opinion, has expressed skepticism about this portion of the *Sharon* opinion. Thus, recognizing that *"Dunhill* appears to require a certain amount of formality to indicate that the act is in fact the act of the sovereign," the Second Circuit noted that it is "probably not the degree of formality suggested by former Judge Sofaer in *Sharon*, 599 F.Supp. at 544–45." *Marcos*, 806 F.2d at 359. Finally, formality is required not as an end in itself, but to show that these were indeed governmental acts and not private ones. Even *Sharon* recognized that the requirement of formality is usually only applicable where an act of state is alleged "with respect to a subject not normally controlled by public acts." 599 F.Supp. at 544. Where the acts in question are inherently governmental—such as expropriation of private property or creation of public monopolies—the formality requirement serves no purpose. Such acts can only be effective if they were recognized and treated as official governmental acts. Here, Mr. Marcos could only have enriched himself by such acts if they were recognized and accepted as an exercise of his governmental authority.

(2d Cir.) (rejecting attack on Nazi confiscation based on failure to comply with German law), *cert. denied,* 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947).[10]

Plaintiff argues, however, that Mr. Marcos' actions were not the sovereign acts of the Philippines because they were not authorized by Philippine law. *Banco de Espana* rejected this very argument:

> [Banco de Espana] contends that the acts, if they took place, were unlawful under Spanish law, that under Spanish law an illegal act by a public officer strips him of his official cloak and makes his act a private one, and that such a "private" act cannot be deemed governmental. But this is only a variation of the argument we have just rejected. By a "governmental act" is meant no more than a step physically taken by persons capable of exercising the sovereign authority of the foreign nation. The officials of the then-recognized Spanish government possessed such authority. If they purported to act in their official capacity, that physical fact precludes us from examining the validity of their acts under local law. The Spanish local law as a whole is of no concern to us, and it follows that we may not employ one doctrine of that law—that the illegal act of a public officer is deemed a private act—in order to gainsay the physical occurrence of an official act by an officer of the Spanish government.

114 F.2d at 444. *Cf. West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 828 (9th Cir.1987) (court should, as a matter of comity, "presume that Mexican officials are acting in a manner consistent with the requirements of Mexican law").

■ ■ As plaintiff admits, Mr. Marcos was the country's ruler for some two decades. He clearly was "capable of exercising the sovereign authority" of the Philippines during that time. In *Underhill v. Hernandez,* the Court noted that the act of state doctrine "[cannot] be confined to lawful or recognized governments.... The immunity of individuals from suits brought in foreign tribunals for acts done within their own States, in the exercise of governmental authority, whether as civil officers or as military commanders, must necessarily extend to the agents of governments ruling by paramount force as a matter of fact." 168 U.S. at 252, 18 S.Ct. at 84.[11] This would seem to apply a fortiori to Mr. Marcos, who was the recognized head of the Philippine government throughout the relevant period. *See DeRoburt,* 733 F.2d at 703 (approving dismissal of third amended complaint because allegations, inter alia, that defendant falsely accused the president of Nauru of making secret and illegal loans to the Marshall Islands "clearly call into play the acts [sic] of state doctrine"); *West,* 807 F.2d at 828 ("[t]he public capacity of the actors involved ... may serve to trigger the act of state doctrine").

3. Plaintiff advances the somewhat related argument that the act of state doctrine does not apply because the acts in question were not in the "public interests" of the Philippines, having been undertaken by Mr. Marcos for venal, immoral or selfish

---

**10.** Similarly in *Hatch v. Baez* counsel argued that

> [i]t is only to the extent of his just and proper exercise of constitutional and legal powers that the president of Dominica [sic] is to be regarded as the executive of that republic. No unjust or oppressive act committed by his direction upon any one of his subjects, or upon others entitled to protection, is in any true sense the act of the executive in his public and representative capacity, but of the *man* simply, rated as other men are rated in private stations; for in the perpetration of unauthorized offenses of this nature, he divests himself of his "regal prerogatives," and descends to the level of those untitled offenders, against whose crimes it is the highest purpose of government to afford protection.

7 Hun. at 596–97 (emphasis in original) (citations omitted). The court flatly rejected this argument, noting as follows:

> The acts of the defendant for which he is sued were done by him in the exercise of that part of the sovereignty of St. Domingo which belongs to the executive department of that government. To make him amenable to a foreign jurisdiction for such acts, would be a direct assault upon the sovereignty and independence of his country.

*Id.,* at 599.

**11.** The court seemed to go even farther, suggesting that even a putative revolutionary government that failed to gain control of the country would be entitled to protection from liability for actions taken in pursuit of the revolution. 168 U.S. at 252–53, 18 S.Ct. at 84–85.

purposes. The dissent agrees with plaintiff, apparently arguing that acts done by an official "for his own private personal gain" are unofficial acts which may be scrutinized by this court.[12] Nelson Dissent at 1492–93.

Of course, not everything a public official does is an official act; to the extent Mr. Marcos engaged in actions as a private citizen, he is subject to suit like anyone else. *See DeRoburt,* 733 F.2d at 704. Thus, if he entered the public treasury at gunpoint and walked out with money or property belonging to the Philippines, he would not be protected by the act of state doctrine. However, if he gained access to the public monies by statute, decree, resolution, order, or some other "governmental act" as president, the act of state doctrine would be triggered. *See Dunhill,* 425 U.S. at 693–95, 96 S.Ct. at 1860–61; *West,* 807 F.2d at 828; Restatement of Foreign Relations Law of the United States § 469, note 3 (Tent.Draft No. 7, 1986).

Once the acts in question are identified as governmental in character, our courts have uniformly refused to question the integrity or nobility of the reasons underlying them. *See, e.g., Clayco Petrol. Corp. v. Occidental Petrol. Corp.,* 712 F.2d 404, 407 (9th Cir.1983) (refusal to inquire whether foreign government's award of oil concession motivated by bribery), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). "[S]uch inquiries by

this court into the authenticity and motivation of the acts of foreign sovereigns would be the very sources of diplomatic friction and complication that the act of state doctrine aims to avert." *Occidental Petrol. Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 110 (C.D.Cal.1971), *aff'd,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972), *quoted with approval in Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1047 (9th Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983).

The governmental acts of a country's chief executive necessarily reflect complex political and policy choices. That one of the motives behind a particular governmental act may have been selfish, or that it was intended to serve otherwise improper ends, does not make that act any less a pronouncement of the sovereign or render it any less entitled to respect as such from other government. *See West,* 807 F.2d at 828; Restatement § 469, comment 7. It would greatly weaken the act of state doctrine if parties could put in question the validity of official government acts simply by attacking the motives of the government officials who undertake them.

4. Plaintiff next advances the argument that, whatever force the act of state doctrine may have when it is invoked by the government of the country whose actions are questioned, it has little or no force here, where it is the Philippines itself that is asking us to look into the actions of its former dictator.[13] The acquiescence of

---

12. The dissent relies upon the Fifth Circuit's decision in *Jimenez v. Aristeguieta,* 311 F.2d 547 (5th Cir.1962), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963), as support for its contention that official acts of a former dictator do not include acts done for personal gain. Nelson Dissent at 1493–94. Although the alleged misdeeds of Jimenez and Marcos are similar in nature, the contexts in which judicial review is sought are very different.

In *Jimenez,* the Government of Venezuela sought the return to Venezuela of its former dictator pursuant to its Treaty of Extradition with the United States. 311 F.2d at 550–51. The Fifth Circuit held that the act of state doctrine did not bar the court, in habeas corpus review of extradition proceedings, from determining whether there was probable cause of guilt such that extradition to Venezuela was proper. *Id.,* at 557. The court relied on the fact that the political branches had, pursuant to a treaty, expressly contemplated judicial review of

the official's actions. *Id.,* at 558. The act of state doctrine is clearly not a bar under such circumstances. *See Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940 (act of state doctrine does not bar inquiry into validity of sovereign act where there is a treaty defining controlling international law). Here, there is no treaty directing the court to act.

13. Plaintiff also appears to be arguing that Marcos is not protected by the act of state doctrine because he is no longer president. The court in *Hatch* answered a similar argument as follows:

The fact that the defendant has ceased to be president of St. Domingo does not destroy his immunity. That springs from the capacity in which the acts were done, and protects the individual who did them, because they emanated from a foreign and friendly government.

7 Hun. at 600. We agree.

the country's current government, and the fact that the actions in question were taken by a government no longer in power, do have a bearing on the application of the act of state doctrine. In *Sabbatino*, the Supreme Court hinted that this might be a relevant consideration, 376 U.S. at 428, 84 S.Ct. at 940, and one other court has so intimated. *See Marcos*, 806 F.2d at 359.

 There is some reason for this. Where the country's current government seeks an adjudication of these matters, there is obviously less of a possibility that our pronouncements will embarrass our relations with that government.[14] But, just as the position of our own executive branch is not dispositive on the issue, *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 762, 92 S.Ct. 1808, 1810–11, 32 L.Ed.2d 466 (1972); *Marcos*, 806 F.2d at 358, so can we not give dispositive effect to the pronouncement of a foreign sovereign, particularly one with a stake in the current litigation. *Banco de Espana*, 114 F.2d at 444. Embarrassment of our relationship with a foreign government is, after all, only one reason underlying the act of state doctrine. As the court stated in *Sabbatino*, there are others. 376 U.S. at 427–37, 84 S.Ct. at 940–45. While the acquiescence—indeed anxious invitation—of the current Philippine government allays one concern, it heightens others, making us leery of judicial involvement in this dispute.

We cannot shut our eyes to the political realities that give rise to this litigation, nor to the potential effects of its conduct and resolution. Mr. Marcos and President Aquino represent only two of the competing political factions engaged in a struggle for control of the Philippines.[15] While the struggle seems to be resolving itself in favor of President Aquino, this may not be the end of the matter.[16] Only four years ago, the tables were turned, with Mr. Marcos in power and Mrs. Aquino and her husband in exile in the United States. While we are in no position to judge these things, we cannot rule out the possibility that the pendulum will swing again, or that some third force will prevail. What we can say with some certainty is that a pronouncement by our courts along the lines suggested by plaintiff would have a substantial effect on what may be a delicate political balance, as would a contrary pronouncement exonerating Mr. Marcos.

Moreover, litigation proceeds at its own pace and the answer, whatever it may be, may well come at a time most inopportune from the point of view of our foreign policy as it is then conceived.[17] Judicial pronouncements that can have such effects surely implicate "the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Sabbatino*, 376 U.S. at 427–28, 84 S.Ct. at 940. Absent express encouragement from the political branches of our government,[18] *see, e.g.*,

---

**14.** We say "less of a possibility" rather than "no possibility" because, even as things stand, a judicial pronouncement on some of the issues presented could raise foreign relations concerns. For example, we wonder how the current Philippine government would react to a pronouncement by the court of the United States that Mr. Marcos' actions were entirely legal and proper. Of course, plaintiff hopes to prove otherwise, but in assessing whether the act of state doctrine is implicated, we cannot prejudge the outcome of the dispute. Nor can we necessarily assume that the current government will be in power when the case is finally resolved. *See* p. 1486 & n. 16, *infra*.

**15.** *See, e.g., Woman of the Year*, Time, Jan. 5, 1987 at 18–33; Wall St.J., Dec. 29, 1986, at 1, col. 3; N.Y. Times, Dec. 24, 1986, at 7, col. 4.

**16.** In January, for example, some troops of the Philippine Army attempted a putsch with the Marcoses' apparent support. N.Y. Times, Jan. 30, 1987, at 1, col. 1.

**17.** As this court stated in *International Ass'n of Machinists*, 649 F.2d at 1358, the judiciary must focus on single disputes and make decisions on the basis of legal principles. The timing of our decisions is largely a result of our caseload and of the random tactical considerations which motivate parties to bring lawsuits and to seek delay or expedition. When the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy. The executive may utilize protocol, economic sanction, compromise, delay, and persuasion to achieve international objectives. Ill-timed judicial decisions challenging the acts of foreign states could nullify these tools and embarrass the United States in the eyes of the world.

**18.** This was the crux of the Court's holding in *Sabbatino*:

[R]ather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of

*Jimenez*, 311 F.2d at 558, we are reluctant to embark upon such an endeavor. As the Second Circuit recognized with respect to this controversy, "the plaintiff's claims necessarily require determinations that will directly and significantly affect American foreign relations." *Marcos*, 806 F.2d at 352.

The dissent argues that we may not consider the foreign relations consequences of this litigation because "the executive branch has clearly spoken on the question of potential embarrassment to the United States." Nelson Dissent at 1496. This assertion is based on statements made by the Second Circuit in *Marcos*, noting that the government had filed a statement supporting jurisdiction in that case, as well as in a case before the Court of International Trade. *See Marcos*, 806 F.2d at 356–57, 357 n. 3. The dissent deduces that the executive branch would take the same position in all other cases between the Philippines and the Marcoses, including ours. We are reluctant to accept this generalization.

In the first place, we do not know precisely what the executive branch said in those cases, nor the rationale for its position. No documents were filed by the State Department in our case and we do not have copies of those filed elsewhere. All we know about the State Department's position comes from the opinion of the Second Circuit. We find that characterization far too nebulous to permit sweeping inferences about the position of the executive branch. Other than emphasizing the importance of our relations with the Philippines, the Declaration of Undersecretary of State Armacost "refers to the establishment of the official Presidential Commission on Good Government headed by former Philippine Senator Jovito Salonga and to the United States' agreement to receive Senator Salonga at a diplomatic level." *Id.* at 357 n. 3. The Second Circuit then concludes: "Undersecretary Armacost asserted that the Aquino government will view *the United States' actions on this matter* as an important indicator of the future course of our bilateral relations and stated that it is in the foreign policy interests of

the United States to honor *the Philippine government's requests* at the earliest possible time." 806 F.2d at 357 n. 3 (emphasis added). Since the Armacost Declaration was not addressing the Second Circuit litigation but a case before the Court of International Trade, we find it impossible to deduce what "matter" Undersecretary Armacost refers to and what action is expected of the United States. Equally ambiguous is the reference to the "Philippine government's requests" mentioned by Armacost. Since we do not know the context in which the Armacost declaration was filed, we have no way of knowing what Armacost was referring to. His mention of the Philippine Commission on Good Government gives us a hint, however. In the papers filed before us is a copy of one of President Aquino's executive orders which sets forth the charter of that commission:

> The Commission on Good Government is hereby authorized *to request* and appeal to *foreign countries wherein any such assets or properties may be found to freeze them* and otherwise prevent their transfer, conveyance, encumbrance, concealment or liquidation by former President Ferdinand E. Marcos and Mrs. Imelda Romualdez Marcos, their close relatives, subordinates, business associates, dummies, agents, or nominees, *pending the outcome of appropriate proceedings in the Philippines* to determine whether such assets or properties were acquired by such persons through improper or illegal use of funds belonging to the Government of the Philippines or any of its branches, instrumentalities, enterprises, banks, or financial institutions or by taking undue advantage of their office, authority, influence, connections or relationship.

President of the Philippines, Exec.Order No. 2 at 3 (March 12, 1986) (emphasis added). We assume that the requests to which Mr. Armacost refers are those mentioned in the commission's charter, namely for foreign governments to freeze assets of the Marcoses while the matter of ownership is litigated in the Philippines. That is

---

property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, *in the absence of a treaty or other unambiguous agreement regarding controlling legal princi-*

*ples,* even if the complaint alleges that the taking violates customary international law. 376 U.S. at 428, 84 S.Ct. at 940 (emphasis added).

precisely what happened in the Second Circuit.[19]

The Second Circuit case is materially different from ours in ways that are highly relevant to the application of the act of state doctrine. *See* n. 25 *infra*. Most significant, in that case "the district court will not be asked to try the basic issues accusing President Marcos of unlawful takings," 806 F.2d at 361, since such matters are to be determined in the Philippines. In our case, these matters would be litigated here.[20]

5. Finally, we consider it significant that such law as there may be to apply in determining whether Marcos' actions were legal is that of a foreign nation. As the Court noted in *Sabbatino*, "[a]n inquiry by United States courts into the validity of an act of an official of a foreign state under the law of that state would ... be exceedingly difficult...." 376 U.S. at 415 n. 17, 84 S.Ct. at 933 n. 17. Moreover, it is not the Philippines' private law we would be interpreting, but important aspects of its public law. The question of whether Mr. Marcos properly invoked martial law, or whether he exercised it properly, if it has an answer in Philippine law at all, is no doubt of considerable importance and sensitivity to that country and its people. So is Mr. Marcos' invocation of presidential immunity under Article VII, Section 17 of the Philippine Constitution in force at the time

Mr. Marcos was president,[21] a provision that, apparently, has been carried forward into the current constitution. Were we to answer this latter question, it would be as if *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), defining the immunity of American presidents, had been decided by the Supreme Court of the Philippines. As *Sabbatino* noted, such a determination "if wrongly made, would be likely to be highly offensive to the state in question." 376 U.S. at 415 n. 17, 84 S.Ct. at 933 n. 17.

### D.

■ In *International Association of Machinists*, we noted that "[t]he act of state doctrine is similar to the political question doctrine in domestic law." 649 F.2d at 1358; *see also Sharon*, 599 F.Supp. at 547. Questions that appear to implicate one doctrine are sometimes best resolved by reference to the other. *See, e.g., Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1201 (5th Cir.1978), *cert. denied*, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979).

Thus, even if we put to one side the foreign affairs implications of any decision an American court may reach on the merits, and even if our own political branches were to pronounce their willingness for us to hear the case, we would still be faced

---

**19.** Equally unhelpful is the executive branch's pronouncement in *Marcos* itself. The most the Second Circuit was able to say about that statement is that *"[b]y implication* [the Justice Department] position carries with it the proposition that the United States does not consider this suit to be an improper intrusion on its management of foreign affairs." *Id.*, at 357 (emphasis added, footnote omitted).

**20.** If an inference is to be drawn from the State Department's pronouncements, it would be from its failure to speak in this case while it did in two others involving the same parties and somewhat related issues. But it is a highly sensitive and delicate undertaking to deduce our State Department's attitude from what it has failed to say. As the Court noted in *Sabbatino*, "[o]ften the State Department will wish to refrain from taking an official position, particularly at a moment that would be dictated by the development of private litigation but might be

inopportune diplomatically." 376 U.S. at 436, 84 S.Ct. at 944. It suffices to conclude that we are not precluded from addressing this issue by what the executive branch has said and done in other cases.

In any event, we doubt that a State Department pronouncement even in this case would materially change our analysis. While embarrassment of foreign relations is a matter we consider, it is a relatively minor consideration in light of the other serious issues raised by plaintiff's case.

**21.** This section provides:

The President shall be immune from suit during his tenure. Thereafter, no suit whatsoever shall lie for official acts done by him or by others pursuant to his specific orders during his tenure.

The immunities herein provided shall apply to the incumbent President referred to in Article XVII of this Constitution.

with the intractable problem of adjudicating the essentially political questions raised by plaintiff's complaint.

■ These problems lie at the very heart of the Republic's case. Plaintiff asserts that "[o]n September 21, 1972 [Mr. Marcos] declared martial law. From and after the declaration of martial law, Mr. Marcos was the dictator of the Government of the Philippines and personally controlled the said government." Fernando ¶ 7. In adjudicating plaintiff's claims, our courts would have to determine the legality of the actions of a foreign head of state, exercising dictatorial powers under a reign of martial law. It is hard to imagine what judicially manageable standards the courts could apply in making such a determination. A dictator is a ruler holding absolute authority; he is generally subject to no legal constraints, only physical and political ones.[22] Martial law constitutes the suspension of civil authority and invocation of rule by decree of a military commander.[23]

If, in adjudicating this dispute, the court were to accept plaintiff's characterization, it is difficult to see what law to apply to Mr. Marcos' actions. By its nature, dictatorial rule is arbitrary and unrestrained by legal authority; martial law is a suspension of the normal rule of law. Offensive as such absolute government may be to our sense of justice, no legal restraints can prevail against dictatorial power. A dictator can do whatever he can get away with. A court of law in this country simply cannot second-guess how that power is exercised. *See Underhill,* 168 U.S. at 254, 18 S.Ct. at 85.

■ Plaintiff is in no better position if it seeks to challenge Mr. Marcos' invocation of martial law and assumption of dictatorial power. Again, there are no judicially manageable standards for us to apply in second-guessing that decision. Just as we cannot second-guess the outcome of an election, or the success of a revolution in a foreign country, *see id.* at 252–53, 18 S.Ct. at 84–85, so can we not adjudicate whether Mr. Marcos was within his rights in asserting dictatorial control over the Philippines starting in 1972.

We must take as given that Mr. Marcos was the country's president, that he was recognized as its head of state by our government,[24] *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918), and that, as plaintiff so bluntly admits, he and his wife were "permitted ... to remain in positions of power and to conduct the affairs of the Philippines virtually unchecked." Complaint ¶ 59. Whether the Philippine people so permitted the Marcoses to rule them out of ignorance, because they were misled, because they considered it to be in their self-interest, or because they were powerless to do otherwise, is something we do not know and have no way of finding out. It is simply beyond the capacity of our courts to adjudicate.

### E.

In light of these considerations, we hold that the district court erred in concluding

---

**22.** The American Heritage Dictionary (New Coll.Ed.1976), defines dictator as "[a] ruler having absolute authority and supreme jurisdiction over the government of a state; especially, one who is considered tyrannical or oppressive." *Id.,* at 366. Black's Law Dictionary (5th ed. 1979) defines a dictator as "[o]ne in whom supreme authority in any line is invested, one who rules autocratically, and one who prescribes for others authoritatively, and [often] oppressively." *Id.,* at 409 (citing *Houston Printing Co. v. Hunter,* 105 S.W.2d 312, 317 (Tex.Ct.Civ.App.1937)).

**23.** Black's Law Dictionary defines martial law as follows:

A system of law, obtaining only in time of actual war and growing out of the exigencies thereof, arbitrary in its character, and depending only on the will of the commander of an army, which is established and administered in a place or district of hostile territory held in belligerent possession, or, sometimes, in places occupied or pervaded by insurgents or mobs, and which suspends all existing civil laws, as well as the civil authority and the ordinary administration of justice.

*Id.* at 878–79. Webster's Third International Dictionary defines the term as "military rule exercised by a nation or state over its citizens or subjects in a situation where they are not legally enemies and when an emergency justifies such action." *Id.* at 1386.

**24.** *See* 1975 Dig.U.S.Prac.Int'l L. 344–45 & n. 1 (noting that Marcos had been granted head of state immunity in a libel action; "a Head of State performs important functions which should not be interfered with by the necessity of defending litigation in foreign countries").

that plaintiff is likely to succeed on the merits of its state claims, or its federal claims for that matter. To succeed under those claims as they are now presented, plaintiff would have to establish that practically all of Mr. Marcos' wealth was stolen. In light of plaintiff's own claims and assertions, we believe that it will be unable to do so because, as to many of the assets in question, adjudication will be barred by the act of state doctrine, the political question doctrine or both. Since plaintiff has not sought to trace specific assets to specific alleged misdeeds, the exclusion of large portions of Mr. Marcos' wealth from adjudication will defeat plaintiff's net worth analysis, and with it, its case. In these circumstances, we cannot even say that the Republic has the "fair chance of success on the merits" needed to remand for a balancing of the hardships. *See Benda*, 584 F.2d at 315.[25]

### Conclusion

The order granting the preliminary injunction is reversed and the preliminary injunction is ordered vacated. The case is remanded to the district court for proceedings consistent with this opinion. To avoid duplication of effort, the panel retains jurisdiction over any further appeals in this case.

CYNTHIA HOLCOMB HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in the result reached in Judge Kozinski's opinion. Indeed, if the district court had had jurisdiction to enter the preliminary injunction, I could agree with it entirely. I respectfully dissent, however, from the jurisdictional holding of Part I of the opinion and join in the remainder.

The majority, in finding that the district court had jurisdiction, relies on the case of *Keniston v. Roberts*, 717 F.2d 1295 (9th Cir.1983), for the proposition that at this stage of the proceedings the complaint must meet only two criteria. First, it must claim a right to recover under the Constitution and laws of the United States. *Id.*, at 1298. Second, the claim set forth in the complaint must not be wholly insubstantial and frivolous. *Id.* The test set forth in *Keniston*, however, is used only " 'for the purposes of determining whether [the plaintiff] stated a cause of action on which relief could be granted.' " *Id.* (quoting *Jackson Transit Authority v. Local Division 1285*, 457 U.S. 15, 21 n. 6, 102 S.Ct. 2202, 2206 n. 6, 72 L.Ed.2d 639 (1982)). The test of whether to grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is inapplicable to the question of whether a plaintiff has made a sufficient showing of subject matter jurisdiction to obtain a preliminary injunction. At the preliminary injunction stage, a more stringent test applies.

In *SEC v. United Financial Group, Inc.*, 474 F.2d 354 (9th Cir.1973), a case both procedurally and factually similar to this one, we addressed the question of whether the district court had subject matter jurisdiction to enter a preliminary injunction. The SEC claimed that the defendants were violating United States secu-

---

**25.** While our dissenting colleague relies heavily on language drawn from the Second Circuit's opinion in *Marcos*, we view our approach as consistent with that of the Second Circuit. In that case, the court asserted jurisdiction over a claim by the Philippines for a very limited purpose: to "freeze [Marcos'] property in the United States subject to future process in [the Philippines]." 806 F.2d at 354. It would therefore be the Philippine courts that would decide whether Marcos' conduct amounted to theft under Philippine law. *Id.* at 361. Moreover, the claims in that case covered only specific "assets in New York." *Id.* In short, the Second Circuit case was "merely ancillary to an eventual Philippine decree or judgment and was brought in the Southern District only because the real estate is located [t]here." *Id.* The Second Circuit con-

trasted the case of *Islamic Republic of Iran v. Pahlavi*, 94 A.D.2d 374, 464 N.Y.S.2d 487 (1983), *aff'd*, 62 N.Y.2d 474, 478 N.Y.S.2d 597, 467 N.E.2d 245 (1984), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985), where plaintiff sought to impose a constructive trust "on assets of the defendants throughout the world." *Id.* 94 A.D.2d at 377, 464 N.Y.S.2d at 490. Our case is far more analogous to *Islamic Republic*.

Quite significant, and unaddressed by the dissent, is the Second Circuit's recognition that to the extent "Marcos's wealth was obtained through official expropriation decrees or public monopolies" they were public acts, potentially subject to the act of state doctrine. 806 F.2d at 359.

rities laws. The district court entered a preliminary injunction in favor of the SEC. On appeal, the defendants argued that all offers and sales of shares were confined to foreigners and, therefore, that the district court did not have subject matter jurisdiction to grant the preliminary injunction. *Id.*, at 356. In reviewing the defendants' claim, this court did not apply the frivolity standard set forth in *Keniston*. Instead, we engaged in a thorough evaluation of the *effect* that the defendants' activities had had upon investors in the United States holding that "focus should be upon appellants' activities within the United States and the impact of those activities upon American investors." *Id.*, at 356–57. *See also Des Brisay v. Goldfield Corp.*, 549 F.2d 133, 134 (9th Cir.1977) (focus in determining whether United States securities laws apply to foreign transactions should be on adverse impact of the transactions on American securities markets); *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F.Supp. 1102, 1105 n. 3 (S.D.N.Y.1984) (focus in determining whether United States antitrust laws apply to international business transactions is on the situs of the effect).

The "effects" test applied in securities and antitrust cases should also be applied in RICO cases. When it passed RICO, Congress was concerned with the harmful effect of organized crime on the economy of the United States:

> The Congress finds that (1) organized crime *in the United States* is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from *America's* economy ... (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt *our* democratic processes; (4) organized crime activities *in the United States* weaken the stability of *the Nation's economic system*, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of *the Nation* and its citizens ...

RICO Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 922 (1970), 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin.News 1073, 1073 (emphasis added). *See also United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir.1981) (effect on commerce is an essential element of a RICO violation), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Thus, in order to maintain a lawsuit under RICO, a plaintiff must demonstrate that the transactions in question adversely affected the economy of the United States.

The complaint before us in this case fails to make the requisite allegations of harm to the economy of the United States;[1] the majority does not hold otherwise. Rather than arguing that the "effects" test is met on the facts of this case, the majority erroneously applies a "conduct" test utilized in the securities law setting. *See Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424–25 (9th Cir.1983) (where conduct in the United States was significant with respect to the alleged violation, there is federal jurisdiction under United States securities laws). The "conduct" test used in the securities context is not applicable in RICO cases. *Cf. United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir.1981) (effect on commerce is an essential element of a RICO violation), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). In passing RICO, Congress was concerned with the *effect* of organized crime on the economy of the United States. Therefore, the "effects" test is the only applicable one. Even if the majority were correct in its assumption that the "conduct" test applies in the RICO context, the test would not be met on the facts of this case. The defendants' conduct in the United States was not a significant element of the harm alleged by the plaintiff. *See, e.g., Grunenthal*, 712 F.2d at 425. As the plaintiff conceded at oral argument, the investment of funds in the United States was no more injurious to the Philippines than if the funds had been kept in a mattress in the Philippines.

I would vacate the injunction on the ground that the district court lacked subject matter jurisdiction to enter it.

---

1. At oral argument, we were advised that the plaintiff had amended its complaint subsequent to the issuance of the preliminary injunction. The propriety of a preliminary injunction under the amended complaint is not before us.

NELSON, Circuit Judge, dissenting:

The majority opinion characterizes this case largely as a political dispute between competing governments, designed to challenge the legitimacy of Marcos' reign. Majority op. at 1475, 1479, 1479–80. This characterization distorts the proper focus of our analysis. In my view, this appeal concerns the attempt by the Republic of the Philippines to secure a preliminary injunction to prevent Ferdinand and Imelda Marcos, and their alleged agents, from transferring, conveying, or encumbering specific properties in California, and other as yet unidentified properties, allegedly purchased with funds stolen from the Republic of the Philippines, pending a final determination of ownership of the properties. The district court concluded that it had subject matter jurisdiction under RICO. Under the pendent claims for conversion, fraud, and deceit, which sought money damages, an accounting, and return of property under a constructive trust,[1] the court issued a preliminary injunction to preserve the status quo pending a determination on the merits. Because I believe that the act of state doctrine does not compel reversal, and that the district court clearly did not abuse its discretion in issuing the preliminary injunction, I respectfully but strenuously dissent from the majority's result and all except part I of the majority opinion, which upholds the finding of subject matter jurisdiction under the federal claims.[2]

## I. THE ACT OF STATE DOCTRINE

The majority would reverse the decision to issue the preliminary injunction because it believes that the act of state doctrine renders the Philippines' likelihood of success on the merits low. I believe that the majority's analysis of the act of state doctrine is incorrect in substantial part as a matter of law and wholly unsupported by the facts and procedural posture of this case. Below I set forth the principal points on which I disagree with the majority's analysis.

### A. The Scope of the Doctrine: Official and Unofficial Acts

Under the act of state doctrine, the courts of this country will not inquire into the legality of official acts of sovereign nations done within their own territories. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 n. 7, 96 S.Ct. 1854, 1859 n. 7, 48 L.Ed.2d 301 (1976); *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 763, 92 S.Ct. 1808, 1811, 32 L.Ed.2d 466 (1972); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964). The doctrine applies to "the public and governmental acts of sovereign states," but not to "their private and commercial acts." *Dunhill*, 425 U.S. at 695, 96 S.Ct. at 1862; *see also Republic of the Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir.1986) (holding that, for the act of state doctrine to apply, "the acts must be *public* acts of the *sovereign*"); *Restatement (Revised) of Foreign Relations Law* § 469, at 51 (Tent.Draft No. 7, 1986) (stating that the doctrine applies only to sover-

---

**1.** The Philippines' verified complaint includes among its allegations of private unlawful conduct:

—that Ferdinand Marcos "converted, to his use and that of his friends, family, and associates, money, funds, and property belonging to the Philippines and its people." Complaint ¶ 12.

—that the Marcoses committed "numerous acts of fraud, deceit, conversion, civil conspiracy, acts of racketeering, and other unlawful acts." *Id.* ¶ 58.

—that the Marcoses stole and transported in their flight from the Philippines to Hawaii approximately $7 million belonging to the Philippine people, including currency, negotiable in-

struments, and transportable property. *Id.* ¶¶ 25–26.

**2.** I emphasize that the Philippines has alleged serious federal offenses under RICO, including mail and wire fraud and the concealment and transportation of stolen property. I also note that the Second Circuit's Marcos case predicated federal jurisdiction on the federal question arising from the foreign policy considerations posed by that action. *Republic of the Philippines v. Marcos*, 806 F.2d 344, 352–54 (2d Cir. 1986).

eign "acts of a governmental character"). Although the doctrine also applies to the official acts of government officials vested with sovereign authority, *see Bernstein v. Van Heyghen Freres, S.A.,* 163 F.2d 246, 249 (2d Cir.), *cert. denied,* 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947); *Banco de Espana v. Federal Reserve Bank,* 114 F.2d 438 (2d Cir.1940), it does not apply to private, unofficial conduct of government officials, including heads of state. *Marcos,* 806 F.2d at 359; *see DeRoburt v. Gannett Co.,* 733 F.2d 701, 704 (9th Cir.1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985). Therefore, to the extent that Ferdinand Marcos, Imelda Marcos, and their agents have engaged in unofficial acts, the act of state doctrine has no application.

The majority's analysis blurs the distinction between the official or unofficial character of the defendants' acts. It first concedes, almost in passing, that "[a] few of Marcos' alleged misdeeds ... may amount to nothing more than common fraud or theft." Majority op. at 1479; *see also id.* at 1485. Yet the majority's analysis then broadly assumes that Marcos is a "dictator" who "can do whatever he can get away with," *id.* at 1478, 1483 n. 9, 1489, and that the challenged acts of the defendants reflect "complex political and policy choices," even if undertaken in part "to serve otherwise improper ends," *id.* at 1485. In short, the majority all but ignores the private, unofficial character of the challenged acts and appears to embrace the sweeping position that the acts of a dictator are necessarily official and insulated from judicial review.[3]

The majority characterizes the Philippines' complaint as challenging, *inter alia,* Marcos' governmental acts of "expropriation of private property; creating public monopolies; 'grant[ing] government favors, contracts, licenses, loans, and other public benefits.'" Majority op. at 1478 (quoting Fernando declaration ¶ 8). In fact, however, the Fernando declaration clearly distinguishes between official governmental acts and private, unofficial acts. The full passage quoted in part by the majority states:

The said taking of Government properties was effected by a range of techniques, including but not limited to accepting payments, bribes, kickbacks, interests in business ventures, and other things of value *in exchange for* the grant of government favors, contracts, licenses, franchises, loans, and other public benefits; expropriating outright private property for the benefit of persons beholden to or fronting for Mr. Marcos, the said expropriation at times effected by violence or the threat of violence or incarceration; arranging loans by the Philippine Government to private parties beholden to and fronting for Mr. Marcos; direct raiding of the public treasury; diverting loans, credits and advances from other governments intended for use by the Philippine Government; creating public monopolies placed in the hands of persons beholden to and fronting for Mr. Marcos.

Fernando declaration ¶ 8 (emphasis added). That a government official may obtain kickbacks, bribes, and interests from the commission of otherwise governmental acts—such as granting a public monopoly or governmental contract—does not convert the acquisition of those kickbacks, bribes, and interests into official, public acts. The majority evidently believes that whatever acts are associated with an ostensibly governmental function are thereby rendered official. I cannot adhere to the position that the alleged acts of receiving bribes, plundering the treasury, and extortion are the result of "complex political and policy choices." Majority op. at 1485. Even a dictator is capable of performing private, unofficial acts.

In *Jimenez v. Aristeguieta,* 311 F.2d 547 (5th Cir.1962), the Fifth Circuit drew a clear distinction between the official acts and private conduct of a former head of state who was characterized as a dictator. The Republic of Venezuela alleged that Marcos Perez Jimenez, the former president of Venezuela, had committed "financial crimes for his own private personal gain" during the period he served as president. *Id.* at 552. The financial crimes included receiving kickbacks and commis-

---

**3.** In Section I.D below, I address the consequences of a more generous reading of the majority's analysis that would in fact permit inquiry into the defendants' unofficial acts of "common fraud or theft."

sions on government contracts, misappropriating and diverting government payments on construction contracts and land purchases, and securing improvements to his private estate at public expense. *Id.* Jimenez contended that the acts alleged were " 'acts done in the exercise of or in color of his sovereign authority' " and, as such, could not be examined by the courts of this country " 'inasmuch as the judicial authorities cannot review the acts done by a sovereign in his own territory to determine illegality.' " *Id.* at 557. Jimenez argued "that as a 'dictator' he himself would be the sovereign—the government of Venezuela—and that all his acts constituting the financial crimes with which he is charged ... are acts of state or sovereign acts, the legality of which the Act of State Doctrine precludes [courts from adjudicating]." *Id.* The Fifth Circuit disagreed:

> Even though characterized as a dictator, appellant was not himself the sovereign—government—of Venezuela within the Act of State Doctrine. He was chief executive, a public officer, of the sovereign nation of Venezuela. It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies.

> Appellant's acts constituting the financial crimes of embezzlement or malversation, fraud or breach of trust, and receiving money or valuable securities knowing them to have been unlawfully obtained ... were not acts of Venezuela sovereignty.... *[E]ach of these acts was "for the private financial benefit" of the appellant. They constituted common crimes committed by the Chief of State done in violation of his position and not in pursuance of it. They are as far from being acts of state as rape.*

*Id.* at 557–58 (citations omitted) (emphasis added);[4] *see also DeRoburt,* 733 F.2d at 704 (distinguishing between the official sovereign acts of the Republic of Nauru, to which the act of state doctrine may apply, and the private, unofficial conduct of its current president, to which the doctrine does not apply).

The Second Circuit also made this distinction clear in its analysis of the applicability of the act of state doctrine to the financial crimes alleged to have been committed by Ferdinand Marcos. *Marcos,* 806 F.2d at 358–59. As in *Jimenez,* Marcos was characterized as a "dictator ... with personal control over [the] government and economy." *Id.* at 348. The Second Circuit held:

> Appellants simply fail to make the crucial distinction between acts of Marcos as head of state, which may be protected from judicial scrutiny even if illegal under Philippine law, and his purely private acts. Although the distinction between public and private acts of a foreign official may be difficult to determine, our courts have repeatedly done so.

*Id.* at 359 (citations omitted).

Therefore, to the extent that the majority holds that the act of state doctrine necessarily bars inquiry into Marcos' acts because of his status as a "dictator," I cannot agree. The doctrine applies only to his official acts.[5] As a descriptive matter, Marcos and his agents no doubt exercised broad power, especially after the imposition of martial law in 1972. But the appropriate inquiry is not to invoke the talismanic label "dictator." The district court should determine which of the challenged acts were official and which were not. Only by doing so can the court determine the extent to which the act of state doctrine may

---

**4.** The majority apparently concedes the distinction drawn in *Jimenez* between official and unofficial acts of a dictator, but distinguishes *Jimenez* on the ground that judicial review in that case was permitted because of the existence of an extradition treaty. Majority op. at 1484 n. 12. I agree, but do not see the point. *Jimenez* still supports the distinction between official and unofficial acts, even for a dictator. The existence of a treaty is relevant to the separate question of embarrassment of our executive branch, discussed below. I do not understand the majority to suggest that the absence of a

treaty in this case requires invocation of the act of state doctrine. We must look to other indications from our executive branch. *See infra* Section I.C.

**5.** The Philippine Constitution itself recognizes a distinction between official and unofficial acts of the president. It affords the president complete immunity from any suit brought during his tenure, but provides immunity from suit after he leaves office only for "official acts done by him or by others pursuant to his specific orders during his tenure." Philippine Const. art. VII, § 17.

apply. The majority's analysis sweeps them all together.

### B. The Burden of Asserting the Act of State Doctrine

The majority also fails to take heed of the well-established rule that the burden of establishing that particular conduct constitutes an "act of state" subject to the act of state doctrine is on the party invoking the defense. *See Dunhill,* 425 U.S. at 695, 96 S.Ct. at 1861; *Marcos,* 806 F.2d at 359. In granting the preliminary injunction against Marcos in the Second Circuit case, District Judge Leval held:

> [T]he applicability of the doctrine is not demonstrated on the present record. Defendants have made no showing that the acts alleged against Ferdinand Marcos, much less Imelda Marcos, would necessarily be protected from United States court adjudication.

*New York Land Co. v. Republic of the Philippines,* 634 F.Supp. 279, 289 (S.D.N.Y.), *aff'd, Republic of the Philippines v. Marcos,* 806 F.2d 344 (2d Cir.1986). The Second Circuit agreed. "Since the burden of proof is on the party invoking the act of state defense, appellants must ultimately demonstrate that the challenged acts of Marcos were in fact public acts (the allegations of the complaint covering both public and private acts)." *Marcos,* 806 F.2d at 359–60 (citations omitted). The Second Circuit concluded:

> In short, the district court will necessarily scrutinize the acts that The Republic challenges. Defendants must present evidence that these acts were public (e.g., that Marcos's wealth was obtained through official expropriation decrees or public monopolies). The court then must decide whether to examine these public acts in light of the considerations discussed above. If it chooses not to do so—and the determination whether the Marcoses obtained their wealth illegally ... is impossible without such scrutiny— the court should consider deferring to a Philippine adjudication that comports with due process. But in any event, at this stage we agree with the position of

the United States ... that the defendants have not discharged their burden of proving an act of state. Only after that burden is met do other relevant factors need to be considered.

*Id.* at 359.

In this case, Marcos and his co-defendants have not pointed to even a single official sovereign act by which Marcos has acquired any portion of the funds used to purchase the real property and invest in the accounts at issue here. Instead, Marcos merely asserts that *all* of his conduct during the past twenty years, private and sovereign alike, is subject to the act of state doctrine. The majority's assertion that Marcos is a "dictator" whose acts are insulated from judicial scrutiny eviscerates the defendants' burden of establishing the applicability of the defense to particular acts. Indeed, most of the majority's analysis proceeds on the theory that the *plaintiff* must show that the doctrine does not apply. Majority op. at 1482–88. At this stage of the proceedings, Marcos and his co-defendants have not met their burden of establishing that the challenged acts were official acts to which the act of state doctrine may apply.

### C. The Assertion of Embarrassment to the United States Executive Branch

The act of state doctrine was "judicially created to effectuate general notions of comity among nations and among the respective branches of the Federal Government." *First Nat'l City Bank,* 406 U.S. at 762, 92 S.Ct. at 1811. "[T]he doctrine was not compelled by the nature of sovereignty, by international law, or by the text of the Constitution. 'Rather, it derives from the judiciary's concern for its possible interference with the conduct of foreign affairs by the political branches of the government.'" *DeRoburt,* 733 F.2d at 703 (quoting *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597, 605 (9th Cir.1976)) (citations omitted); *see also Sabbatino,* 376 U.S. at 421–23, 84 S.Ct. at 936–38.

Particularly disturbing in the majority's analysis are the bare assertions that invo-

cation of the act of state doctrine is necessary to prevent embarrassment to the executive branch of the United States by this litigation. Majority op. at 1482, 1486 n. 14, 1486. The majority states that "[o]ur decision will be relatively innocuous only if it is in favor of the plaintiff, if our government's attitudes toward the Philippines is unchanged and if the current Philippine government is still in power." *Id.* at 1482. It asserts that to permit this action to proceed in a United States court may embarrass the United States because the "pendulum" of power between President Aquino and Mr. Marcos or "some third force" may "swing again." *Id.* at 1486.

Putting aside the likelihood of these political predictions actually coming to pass, it is not clear why the majority believes that such potential embarrassment would outweigh the certain, immediate embarrassment in our relations with the current Philippine government if our courts were to shut the door to the Philippines' request for adjudication of the claims. "[T]he act of state doctrine reflects respect for foreign states, so that when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker." [6] *Marcos,* 806 F.2d at 359. "The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence ... for the political interest of this country may, as a result, be measurably altered." *Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940. In such a case, "the danger of interference with the Executive's conduct of foreign policy is surely much less than the typical case where the act of state is that of the current foreign government." *Marcos,* 806

F.2d at 359. If at some future time a new political upheaval should bring Marcos back to power, the district court could then reassess the balance of considerations determining the applicability of the act of state doctrine.

Regardless of the merits of the majority's speculation as to the foreign policy consequences of any action or inaction by our courts, I believe that such speculation is entirely inappropriate in this case. The majority opinion ignores the fact that the executive branch has clearly spoken on the question of potential embarrassment to the United States in similar cases. Our executive branch has urged the courts of this country to honor the Philippines' requests for adjudication here and has argued on the Philippines' behalf against the applicability of Marcos' defenses to suit in our courts. *Marcos,* 806 F.2d at 356–57. In a declaration by Michael H. Armacost, Undersecretary of State for Political Affairs, made on March 15, 1986, in a Marcos case pending in the United States Court of International Trade,

> Undersecretary Armacost pointed out that the United States' relations with the Philippines are extremely important and that it is the policy of the United States to strengthen and broaden those relations, especially in light of the two countries' shared basic values such as a commitment to democratic government and respect for human rights. The Armacost declaration also points out that the United States has two of its largest overseas military facilities located in the Philippines, facilities of critical importance to the security of both nations, that the two countries have numerous defense agreements, and that the United States has

---

**6.** In another Marcos case, the Fourth Circuit recently rejected the Marcoses's argument that they should be entitled to head-of-state immunity, a doctrine of customary international law. The Fourth Circuit explained:

> Head-of-state immunity is founded on the need for comity among nations and respect for the sovereignty of other nations; it should apply only when it serves those goals. In this case, application of the doctrine to Ferdinand and Imelda Marcos would clearly offend the present Philippine government, which has

sought to waive the Marcos[es]' immunity, and would therefore undermine the international comity that the immunity doctrine is designed to promote. Our view is that head-of-state immunity is primarily an attribute of state sovereignty, not an individual right. Respect for Philippine sovereignty requires us to honor the Philippine government's revocation of the head-of-state immunity of Mr. and Mrs. Marcos.

*In re Grand Jury Proceedings: John Doe # 700,* 817 F.2d 1108, 1110–11, (4th Cir.1987).

provided the Philippines with over $250 million in military assistance in the past five years and permits Philippine nationals to enlist in the United States Navy.

The statement also emphasizes the important United States-Philippine economic relationship involving in 1985 alone over $3.7 billion worth of bilateral trade, a direct United States investment in the Philippines of over $1.2 billion, and United States monetary aid to the Philippines totaling $226 million. The statement also notes United States-Philippine cooperation in numerous areas including agriculture, education, nuclear energy, and science, and mentions that the United States government recognized the new Philippine government headed by Corazon Aquino and "welcomed its commitment to fulfill the democratic aspirations of the Filipino people." The declaration refers to the establishment of the official Presidential Commission on Good Government headed by former Philippine Senator Jovito Salonga and to the United States' agreement to receive Senator Salonga at a diplomatic level. Undersecretary Armacost asserted that the Aquino government will view the United States' actions on this matter as an important indicator of the future course of our bilateral relations and stated that *it is in the foreign policy interests of the United States to honor the Philippine government's requests at the earliest possible time.*

*Id.* at 357 n. 3 (emphasis added). The Second Circuit also noted that a letter from the United States Department of Justice, with the concurrence of the Office of the Legal Advisor to the Department of State, argued that Marcos and his co-defendants had not discharged their burden of proving acts of state. *Id.* at 356–57.

Thus, the Second Circuit concluded that "[t]he United States has made it clear that it does not fear embarrassment if the courts of this country were to take jurisdiction of *this and other disputes* between The Republic and ex-President Marcos." *Id.* at 356 (emphasis added). The majority's assertion that adjudication of the Philippines' claims in a United States court would cause embarrassment to our executive branch is therefore unfounded.[7] Given such guidance, it is not the judiciary's role to appraise the wisdom of the executive branch's foreign policy.

Although the position of our own executive branch is not dispositive of the act of state inquiry, *see id.* at 358, the executive's appraisal of the disruptive effect that denying the Philippines access to our courts would have on the conduct of sensitive foreign policy is entitled to considerable deference. *See First Nat'l City Bank,* 406 U.S. at 768, 92 S.Ct. at 1813 (holding that the United States courts should defer to the executive "where the Executive Branch, charged as it is with primary responsibility for the conduct of foreign affairs, expressly represents to the Court that application of the act of state doctrine would not advance the interests of American foreign policy"); *id.* at 776, 92 S.Ct. at 1817 (Powell, J. concurring) (stating that "[w]hen it is shown that a conflict in those roles [of the judicial and political branches] exists, ... the judiciary should defer"); *id.* at 790, 92 S.Ct. at 1824 (Brennan, J., concurring) (stating that "the representations of the Department of State are entitled to weight for the light they shed on the permutation and combination of factors underlying the act of state doctrine"); *Jimenez,* 311 F.2d at 558 (stating, with respect to the separation of powers concern underlying the act of state doctrine, that the judiciary

---

7. The majority's attempt to explain away the significance of the statements and actions of our executive branch in other Marcos suits, *see* Majority op. at 1487–88, is strained and unpersuasive. Every indication supports the conclusion that the executive branch fears no embarrassment from the Philippines' suit. Conversely, the majority can point to no evidence that would support its contrary ruminations on foreign policy.

Moreover, the majority infers that the executive branch supports granting the Philippines'

requests to freeze Marcos' assets *only* if ultimate adjudication on the merits is made in Philippine courts. *Id.* at 1487–88. Here, the Philippines has requested a freeze of assets; at a later date, the district court will rule on the forum non conveniens issue and determine where the merits will be tried. Ironically and illogically, the majority concludes that, because the Philippines has also requested adjudication of the merits in our courts, *no* freeze will issue.

customarily defers to the executive branch, "the branch of government charged with international relations").[8] Given the executive branch's guidance on whether our courts should entertain the Philippines' claims, the majority's assertions to the contrary—though suspect on their own terms—are inappropriate and unfounded.

### D. The Relationship of the Act of State Doctrine to the Probability of Success on the Merits

The majority reasons that, because the act of state doctrine bars inquiry into all or most of the challenged acts, the Philippines' "net worth" theory will collapse, thus rendering the plaintiff's probability of success on the merits low. Majority op. at 1480–81. I cannot agree with this argument's predicate or its ultimate conclusion.

As discussed above, the majority's analysis casts the scope of the act of state doctrine far too broadly, ignores the defendants' burden of proving its applicability, and disregards the guidance of our executive branch. The majority prematurely assumes that only "[a] few" of Marcos' acts will prove to be private, unofficial acts, while "the vast majority" will prove to be public, official acts. Majority op. at 1479, 1482. This guess as to the proportion of official and unofficial acts ignores not only Marcos' burden of proving which acts are in fact official, but also the incomplete record before the district court when it ruled on the preliminary injunction. But even assuming (1) that Marcos could later establish that some challenged acts were official and (2) that the district court would determine, after "balanc[ing the] relevant considerations,"[9] see Sabbatino, 376 U.S.

at 428, 84 S.Ct. at 940, that the act of state doctrine bars claims based on those official acts, I cannot conclude that the Philippines will be unable to recover on the basis of private, unofficial acts that the doctrine does not reach. The majority simply asks too much of the Philippines' "net worth" theory, especially in view of the procedural posture of this case. It treats the "net worth" theory almost as a cause of action that must be followed through to completion at trial. See Majority op. at 1479–81. However, it is merely the evidence of wrongdoing that the Philippines has compiled at this preliminary stage.

The Philippines filed this action on June 16, 1986. The complaint alleged pendent claims for conversion, fraud, and deceit. It charged that the Marcoses reported $337,429 of income during the twenty-year period during which Marcos was in office, while holding investments of $1.55 billion. In support of its preliminary injunction motion, the Philippines produced evidence corroborating this discrepancy and documentation of the "paper trail" linking the Marcoses to specific properties and bank accounts through aliases and shell corporations. See infra pp. 1500–01. On the basis of this evidence, on June 25, 1986—before the parties had conducted discovery—the district court granted the preliminary injunction.

At this stage of the litigation, the Philippines set forth its "net worth" theory as evidence in support of its request for a preliminary injunction. The evidence of a discrepancy on the order of $1.55 billion, coupled with specific documentation of the paper trail, is highly probative of wrongdoing. But we have no reason to conclude,

---

**8.** Unaccountably, the majority asserts that even an explicit instruction from the executive branch in this case probably would not materially alter its analysis and that embarrassment to foreign relations is "a relatively minor consideration." Majority op. at 1488 n. 20.

**9.** Far from being an "inflexible and all-encompassing rule," Sabbatino, 376 U.S. at 428, 84 S.Ct. at 940, the question " '[w]hether to invoke the act of state doctrine is ultimately and always a judicial question.' " Marcos, 806 F.2d at 358 (quoting Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 521 n. 2 (2d Cir.),

cert. dismissed, — U.S. —, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985)). Application of the doctrine requires "a balancing test with the critical element being the potential for interference with our foreign relations." DeRoburt, 733 F.2d at 703; Banco Credito Agricola, 757 F.2d at 521 ("The doctrine demands a case-by-case analysis of the extent to which in the context of a particular dispute separation of powers concerns are implicated" with primary emphasis on whether "judicial consideration of the foreign sovereign's act ... would embarrass or hinder the executive in the realm of foreign relations."). See supra pp. 1495–96.

much less require, that the Philippines must proceed on a "net worth" theory at trial, after discovery has taken place. Therefore, even if the act of state doctrine *might* bar inquiry into some official acts, thus weakening a "net worth" evidentiary theory, I cannot conclude that the Philippines' substantive claims must fail at trial.

### E. Conclusion

We cannot ignore the substantial allegations of private, unofficial acts of common theft, misappropriation, fraud, and concealment merely because Marcos was serving as the Philippines' president when he allegedly committed these crimes. Just because Marcos was in a position to commit these acts when he was president does not render these acts "official." The majority concedes that "if [Marcos] entered the public treasury at gunpoint and walked out with money or property belonging to the Philippines, he would not be protected by the act of state doctrine." Majority op. at 1484. This, I believe, expresses the essence of the Philippines' complaint—whether the Marcoses raided the public treasury "at gunpoint," by extortion, or by theft.

The Second Circuit addressed a similar factual situation and the identical issue we face here—whether the act of state doctrine renders the Philippines' probability of success on the merits low—in a well-reasoned unanimous opinion affirming the issuance of a preliminary injunction against Marcos. *Republic of the Philippines v.*

*Marcos,* 806 F.2d 344 (2d Cir.1986). The Second Circuit rejected Marcos' argument that the act of state doctrine precludes inquiry by the courts of this country into his alleged misdeeds. The court held that Marcos had failed to sustain his burden of demonstrating that the acts of theft, misappropriation, fraud, and concealment alleged by the Philippines were all official sovereign acts, to which the act of state doctrine may apply, rather than private acts, to which the doctrine does not apply. *Id.* at 348–49, 359. The court observed that our executive branch had expressly supported the Philippines' suits against Marcos in this country. *Id.* at 356–57 & n. 3. The court concluded that Marcos had not demonstrated that the act of state doctrine was likely to apply reducing the Philippines' likelihood of success on the merits to less than a substantial probability. The court also stated that, although the Philippines had requested only a preliminary injunction and recognition of an eventual Philippine decree in that case, *see id.* at 361, there was *"no bar to the grant of a preliminary injunction and the district court may either itself determine ownership or defer to Philippine proceedings,"* id. at 356 (emphasis added).[10] The reasoning of the Second Circuit is persuasive. I believe that the district court correctly concluded that, at least at this stage of the proceedings, the act of state doctrine does not have a negative impact on the calculus of the Philippines' likelihood of success on the merits.[11]

---

**10.** The majority's attempt to distinguish the Second Circuit case on the ground that adjudication on the merits would take place in the Philippines, *see* Majority op. at 1490 n. 25, is thus inconsistent with that court's own assessment of the case.

**11.** A related argument advanced by the defendants and apparently adopted by the majority, *see* Majority op. at 1488–90, is that resolution of the merits in this case will be thwarted by problems of justiciability. The Second Circuit found that "there is nothing more unmanageable about this case than about any other case involving theft, misappropriation, corporate veils, and constructive trusts." *Marcos,* 806 F.2d at 356. I agree. Once the role of the act of state doctrine in this case is put into proper perspective, the potential for justiciability problems in this case does not loom large. First, no legitimate "political ques-

tions" are raised by this litigation outside of the prudential considerations relevant to analysis of the act of state doctrine. Second, although the district court has not yet ruled on what law will apply to each of the pendent claims, the defendants present no basis on which to believe that the selection of appropriate state, federal, and Philippine law will be difficult.

Even if the district court ultimately determined that Philippine courts were the appropriate forum in which to try the merits of those issues governed by Philippine law, the court would nonetheless maintain the preliminary injunction freezing the assets pending the resolution of those issues. In such a case, the court might still retain jurisdiction to adjudicate the claims based on federal and state law and to enforce any judgment based on a trial in Philippine or American courts.

## II. THE ISSUANCE OF THE PRELIMINARY INJUNCTION

The majority does not discuss the district court's assessment of the probability of success on the merits of the pendent claims on which the preliminary injunction was based, because of its reliance on the act of state doctrine. Since I believe that the act of state doctrine does not bar the preliminary injunction, I wish to emphasize that the district court's application of the preliminary injunction test was correct.

In order to obtain a preliminary injunction, the Philippines may "demonstrate the probability of success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor." *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir.1987). We review the district court's determination with respect to probability of success for abuse of discretion. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984). At the preliminary injunction stage, "[t]he district court is not required to make any binding findings of fact; it need only find probabilities that the necessary facts can be proved." *Id.* at 1423. The district court may "reasonably assume that more evidence in the same vein" as that offered in support of the preliminary injunction "could be produced at trial." *Id.*

The majority suggests, but does not decide, that the probability of success should be determined by looking at both the federal RICO claims, on which subject matter jurisdiction is predicated, and the pendent claims, under which the injunction was issued. Majority op. at 1480; *see also id.* at 1479. I believe that the probability of success on the merits should be determined solely by reference to the pendent claims when, as here, the federal claims cannot support injunctive relief. *See USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir.1982) (analyzing only the pendent state claims when RICO established subject matter jurisdiction).

This approach fully supports the policies underlying pendent jurisdiction—"the conservation of judicial energy and the avoidance of multiplicity of litigation," *Rosado v. Wyman*, 397 U.S. 397, 405, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970)—that would be defeated if plaintiffs were encouraged to bring parallel actions in federal and state courts in order to obtain a preliminary injunction under the pendent claims. This approach also renders unnecessary any speculation by the district court or the court of appeals as to whether the district court would, in the exercise of its discretion, retain or dismiss the pendent claims in the event the federal claims are dismissed on a Rule 12(b)(6) motion or summary judgment at some later date. *See In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1490–91 (9th Cir.1985) (retaining pendent claims after a Rule 12(b)(6) dismissal of federal claims for reasons of judicial economy, convenience, and fairness to the parties); *Arizona v. Cook Paint & Varnish Co.*, 541 F.2d 226, 227 (9th Cir.1976) (per curiam), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977). In the event that early dismissal of the RICO claims should occur in this case, a preliminary injunction issued solely on the basis of the pendent claims would have preserved the status quo with respect to those claims, whether the district court retains jurisdiction over them or decides that they should be pursued in another forum. It would be ironic indeed if the district court were to deny a preliminary injunction in part on the basis of an assessment of the federal claims, later dismiss those claims but retain jurisdiction over the pendent claims, and then realize that a preliminary injunction should be issued under the retained pendent claims. Therefore, I believe that the proper inquiry is to determine the likelihood of success of the pendent claims alone.

In this case, the Philippines offered a verified complaint, supporting affidavits, and evidence, including the Marcoses' income tax documents, Swiss and California bank documents showing the establishment of accounts under aliases and the subsequent investment by Ferdinand and Imelda Marcos of substantial amounts of funds originating in the Philippines, and deed and trust documents reflecting a complicated series of investments by Marcos in real property in this judicial circuit. Marcos

and his co-defendants failed to offer any affidavits or evidence to contradict the affidavits and evidence offered on behalf of the Philippines. The district court properly could presume that the Philippines' evidence and affidavits were true. *See* 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2949, at 474–75 (1973).

The materials before the district court provided a reasonable basis for it to conclude that the Philippines would be able to establish at trial, after discovery had fully taken place, the necessary facts to show that the Philippines had indeed been the victim of theft, misappropriation, fraud, and concealment at the hands of the defendants. The Philippines produced documentation of the Marcoses' past income tax returns and an affidavit of Benigno Alas, formerly a licensed CPA in the Philippines, which analyzed those documents. The analysis strongly indicates that at least some, and probably a large part, of the Marcoses' current assets were wrongfully acquired. Mr. Alas concluded that the discrepancy between the Marcoses' aggregate income of $337,429 during the twenty-year period Marcos was in office and their alleged current assets of $1.55 billion would be "extremely difficult, if not impossible, to explain from lawful sources."

The verified complaint and an affidavit of Rafael Fernando, West Coast Representative and Coordinator of the Philippines' Presidential Commission on Good Government, charge that the Marcoses acquired much of these assets through conversion, fraud, deceit, use of undue influence, and conspiracy. Although some of these allegations may be based on hearsay and thus be inadmissible at trial, in view of the exigent circumstances attending application for a preliminary injunction, the district court could properly consider them. *See Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984); 11 C. Wright & A. Miller, *supra*, § 2949, at 471–72. In addition, the Philippine government, in creating the Commission on Good Government, stated that it was in possession of evidence showing that the Marcoses' assets were wrongfully acquired through "improper or illegal use of funds or properties owned by the Government of

the Philippines ... or by taking undue advantage of their office, authority, influence, connections or relationship, resulting in their unjust enrichment and causing grave damage and prejudice to the Filipino people and the Republic of the Philippines." Executive Order No. 2, at 1; *see also* Executive Order No. 1, sec. 2(a).

Finally, the Philippines produced uncontroverted evidence indicating that the Marcoses have established Swiss bank accounts under aliases and that funds were transferred to these banks through California banks. It produced evidence of Marcos' transfer of substantial funds from the Philippines into two accounts in Lloyds Bank in California, and documentation concerning the ownership and transfers of interests in the Beverly Hills property. The district court properly could assume that more evidence of the paper trail "in the same vein" would be revealed once discovery had taken place. *See Sierra On-Line,* 739 F.2d at 1423. The uncontroverted evidence of property and funds acquired by the Marcoses, coupled with the evidence discussed above, supports a reasonable conclusion by the district court that the Philippines had a "substantial likelihood" of prevailing on the constructive trust claims for the identified property and on the accounting claim to determine what other, as yet unidentified, property is held by the Marcoses that should also be subject to a constructive trust. Thus, I believe that the district court clearly did not abuse its discretion in finding a substantial likelihood of success on the pendent claims.

The district court also found that the Philippines would suffer irreparable injury without the issuance of a preliminary injunction. The district court found a "substantial danger" that, if a preliminary injunction were not granted, the defendants would transfer or conceal property, funds, books, and records beyond the court's process, thereby vitiating possible relief in the return of specific property under the constructive trust claim and in the examination of books and records under the accounting claim. Based on the evidence of complex transfers and concealment before the district court, the court's factual finding of "substantial danger" was not clearly erro-

neous. Neither was the court's conclusion that the harm to the Philippines resulting from such transfer and concealment would be irreparable. Transfer and concealment of the books and records would prevent the court from being able to provide meaningful relief on the accounting claim; the harm would therefore be irreparable. Moreover, because the Philippines seeks the return of both specific, identified property in California and as yet unidentified property under its quiet title claim, the harm from such transfer and concealment would also be irreparable. Thus, I firmly believe that the district court did not abuse its discretion in granting the preliminary injunction.

At a minimum, I believe that we may affirm on the alternative ground that "serious questions are raised and the balance of hardships tips sharply" in the Philippines' favor. *Hoopa Valley Tribe,* 805 F.2d at 879; *see also Marcos,* 806 F.2d at 346 (upholding a preliminary injunction that the district court had issued on this ground). Clearly, this case presents serious questions on the merits. *See Benda v. Grand Lodge of the Int'l Ass'n of Machinists,* 584 F.2d 308, 315 (9th Cir.1978) (stating that the "irreducible minimum" for issuing a preliminary injunction is whether there is a "fair chance of success on the merits" or the questions are "serious enough to require litigation"), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). The majority opinion summarily, and I believe wrongly, dismisses this alternative approach. Majority op. at 1489–90.

In addition, the district court stated at the conclusion of the preliminary injunction hearing: "Balancing the hardship, the hardship is clearly greater on the side of the plaintiff." Transcript of Preliminary Injunction Hearing at 52.[12] In his appellate brief, Marcos stated that he would agree to freeze the assets involved in this suit if the suit were brought in the Philippines. This statement underscores the point that the issuance of a preliminary injunction imposes no hardship on him. In-

deed, *the defendants have introduced no evidence whatsoever to show how they might be harmed by the issuance of the preliminary injunction.* The injunction is structured to ensure that Marcos will be able to use funds to pay "attorneys' fees and normal living expenses." The only restraint is that the Philippines must have 24 hours' notice of a request to free assets for these purposes. Should it turn out later that the preliminary injunction was wrongfully issued, the $100,000 bond provided by the Philippines under Fed.R.Civ.P. 65(c) will mitigate or cover any financial injury suffered by the defendants as a result of the injunction. *See Costandi v. AAMCO Automatic Transmissions, Inc.,* 456 F.2d 941, 943 (9th Cir.1972) (per curiam); 11 C. Wright & A. Miller, *supra,* § 2948, at 444–45. Therefore, I believe that we may affirm on this alternative ground.

At the very least, prudence in a case as important as this would dictate a remand to the district court to make an explicit finding on the balance of hardships. However, in view of the district court's express statement in open court on the balance of hardships tipping in favor of the Philippines, the absence of any evidence of harm to the Marcoses, and Marcos' representation on appeal that he objected to the forum, not the freezing of his assets, I believe that we may affirm on the alternative ground fairly supported by the record.

In sum, I believe that much of the majority opinion reflects a concern for whether this case should be litigated in United States courts or in Philippine courts. Whether in view of the federal and pendent claims, and the underlying offenses against Philippine law, the district court should exercise its discretion to defer to a forum in the Philippines is a question not before this court. The issue is the propriety of a preliminary injunction to maintain the status quo pending the determination of the forum non conveniens and other issues. I cannot say that the district court abused its discretion in issuing the preliminary injunction. I therefore dissent.

---

**12.** The court's written order did not include this finding. It issued the preliminary injunction instead on the basis of substantial likelihood of success on the merits and substantial danger of irreparable harm to the Philippines.